[Cite as *State v. Crymes*, 2017-Ohio-2655.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 104705

## STATE OF OHIO

PLAINTIFF-APPELLANT

vs.

## HAKIM D. CRYMES

DEFENDANT-APPELLEE

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-602689-A

**BEFORE:** McCormack, P.J., Boyle, J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** May 4, 2017

**ATTORNEYS FOR APPELLANT**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Daniel T. Van
Edward R. Fadel
Assistant County Prosecutors
Justice Center, 9th Floor
1200 Ontario St.
Cleveland, OH   44113


**ATTORNEY FOR APPELLEE**

Russell S. Bensing
1360 East 9th St., Suite 600
Cleveland, OH 44114

TIM McCORMACK, P.J.:

{¶1}   The state of Ohio appeals from a Cuyahoga County Court of Common Pleas decision that dismissed an indictment for rape against Hakim Crymes.   Hakim Crymes, at the time of the alleged offense in 1995, was 17 years old.   He was not charged until 2015, 20 years after the alleged offense.   The trial court, in assessing this 20-year-old accusation, utilized the burden-shifting standard prescribed by the Supreme Court of Ohio.   The trial court found, due to the full 20-year delay in due diligence pursuing this allegation, both that Hakim Crymes suffered actual prejudice to his ability to defend himself and that the prosecution had no justifiable reason for the delay in prosecution. After a careful review of the record and applicable law, we reach the same conclusion. We affirm the trial court's decision.

**Rape Allegation in 1995**

{¶2}   In 1995, 13-year-old C. told her mother that appellee, a friend of hers, then 17,   raped her.   The incident as alleged occurred in the morning of January 16, 1995. C.'s mother, a member of the Cleveland Police Department, made a police report the next day.

{¶3}   Two weeks later, on February 1, 1995, the police questioned Hakim Crymes  about C.'s accusation.   He gave the police a detailed written statement regarding the events leading to the accusation.   C. was his girlfriend.   The two of them had engaged in sexual intercourse once, before Christmas break weeks before.   She called him at 1:00 a.m. on January 16 to make sure he was coming over to her house in the morning.   He

said yes and went back to bed. She called him again at 6:15 a.m. to ask again if he was coming over. He arrived at her house at about 7:10 a.m. She was watching T.V. He sat down and started kissing her. She kissed him back. He started to pull down her pants. She pulled the rest of her clothing off. He took off his pants, and they engaged in sexual intercourse. Afterward, she told him to take a bath. They then sat down to watch TV, with her sitting on his lap. Around 9 a.m., appellee asked C. if they could engage in sex again. She said no, because her sisters were about to wake up. Appellee and C. went back to watch TV. Her sisters woke up soon after. According to appellee's statement, "[w]e were just laughing and joking." He stayed at the house until 11:00 a.m.

{¶4} C. herself was interviewed by the police two days after the incident, on January 18, 1995. C. stated she had known appellee since November 1994. On that day, he came over at around 8:00 a.m.; she let him in. Her sisters, 10 and 11, were asleep in their bedroom. She was on the couch watching cartoons. He pulled her legs and tried to pull down her jogging pants. She tried to pull them back up, and he told her to "just let it go." He then inserted his penis in her vagina. Her sisters woke up after that. C. then told appellee to leave, and he did. C. stated that she screamed for help when he pulled her pants down but her sisters did not hear her. When asked why appellee was at her house early in the morning that day, she answered "I don't know." When asked by the police who else was home at the time, she stated her sisters were

home but did not mention her mother. That night she told a girlfriend about what happened, and the next morning she told her mother.

**{¶5}** After C. told her mother, her mother took her to the emergency room at University Hospitals. There, according to the emergency room nurse's notes, C. told the nurse that appellee was "someone she has had a crush on." According to what C. told the nurse, appellee did not leave immediately after her sisters woke up, but left "later that day." She told a girlfriend about the sexual conduct, and the girlfriend told C.'s cousin about it. The cousin brought appellee to C.'s house the next morning (January 17) to confront him. In front of C.'s mother, both appellee and C. denied anything improper occurred. C.'s mother, however, confronted C. again and wanted to take her to a doctor for testing. C. then told her mother "what had happened." It was unclear from the nurse's notes whether C. described the sexual conduct as forced or otherwise at that time.

**{¶6}** A police report dated February 2, 1995, contained a notation: "all booking cards, reports, and facts sheets to be sent to juvenile court." That notation was the last of any police activity reflected in the record. It then took 20 years for the case to rise from the archives and reach the juvenile court. In 2014, the rape kit collected from C. at the hospital in 1995 was sent to BCI for testing — even though the testing would have yielded no new evidence as the police knew appellee's identity from the very beginning and appellee already acknowledged engaging in sexual intercourse with C. when interviewed by the police. Consistent with appellee's statement, the rape kit was matched to appellee.

**Prosecution Twenty Years Later**

{¶7} Although the DNA match added no new evidence to this stale case, it somehow breathed new life into it. On January 14, 2015, the day before the 20-year statute of limitations would have expired in this rape case, the state filed charges in the juvenile court against appellee, now not a 17-year-old teenager but a 37-year-old man. The juvenile court held that it did not have jurisdiction and dismissed this matter. The state appealed the juvenile court's decision to this court.

{¶8} On that appeal, this court cited R.C. 2151.23(I), which states that the juvenile court has jurisdiction when a juvenile offender is "taken into custody or apprehended" for a criminal matter before the age of 21. This court concluded that it did not have an adequate record for determining whether or not appellee was "taken into custody or apprehended" in 1995 within the meaning of the statute, when he was interviewed by the police. This court reversed and remanded the case to the juvenile court for an evidentiary hearing. *In re H.C.,* 8th Dist. Cuyahoga No. 102601, 2015-Ohio-3676. On remand, the juvenile court conducted a hearing and concluded appellee had not been "taken into custody or apprehended" in 1995 when he was interviewed by the police. Consequently, the juvenile court decided it did not have jurisdiction and again dismissed the case. Subsequently, on January 15, 2016, the grand jury indicted appellee with rape and kidnapping, 21 years after appellee admitted to sexual conduct with C. but claimed the sexual conduct was consensual.

**{¶9}** In response to the 2016 indictment, defense counsel sought to obtain the 1995 phone records to confirm the two phone calls appellee told the police C. made to him in the early morning of January 16, 1995. Counsel learned from the carrier AT&T that no records can be recovered from 1995 for appellee's phone number.

**{¶10}** Appellee filed a motion to dismiss the indictment asserting pre-indictment delay. The trial court conducted a hearing on the motion. Appellee submitted an affidavit from an AT&T compliance security analyst, which stated information regarding appellee's telephone account was unavailable.

**{¶11}** The trial court determined appellee suffered actual prejudice from the preindictment delay and there was no justifiable reason for the delay in prosecution. The trial court noted that appellee told the police in 1995 about the two early morning phone calls he received from C. on the day of the incident asking if he was coming over to her house, yet C. claimed she was surprised that he showed up at her house. The trial court reasoned that, had the case been tried in 1995 and C. denied making the phone calls, appellee would have had the benefit of the phone records to cross-examine her. Because the phone records were no longer available due to the lapse of more than 20 years, appellee's ability to adequately cross-examine his accuser was lost forever. The trial court found the inability resulting from the lost evidence to be significant and constituted actual prejudice in this case. The trial court also noted the accused's identity had been known to the police from the beginning, and the accuser, whose mother was a member of the police department, would also have been readily available for further

investigation.  The trial court concluded there was no justification "whatsoever" for the 20-year delay in the prosecution of this matter.  The court granted appellee's motion and dismissed the case.

{¶12} The state now appeals, raising one assignment of error.  It states: "The trial court erred in dismissing the indictment on grounds of preindictment delay."  We review a trial court's decision on a motion to dismiss for preindictment delay de novo as to the legal issues, but afford great deference to the court's findings of fact.  *State v. Dixon*, 2015-Ohio-3144, 40 N.E.3d 601, ¶ 19 (8th Dist.).

**Preindictment Delay**

{¶13} The Sixth Amendment to the United States Constitution on its face provides no protection to those who have not been charged; however, "[w]hen unjustifiable preindictment delay causes actual prejudice to a defendant's right to a fair trial, despite the state's initiation of prosecution within the statutorily defined limitations period, the Due Process Clause affords the defendant additional protection."  *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 11 ("*Jones II*"), citing  *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

{¶14} In *Jones II*,  the Supreme Court of Ohio reversed this court's en banc decision in *State v. Jones*, 2015-Ohio-2853, 35 N.E.3d 606 (8th Dist.) ("*Jones I*").  In the en banc decision, this court applied a "due process" standard to analyze claims of unconstitutional preindictment delay instead of a long-established burden-shifting two-part test.  The Supreme Court of Ohio explained that this court's decision blurred

the distinctions between the existence of actual prejudice and the lack of a justifiable reason for the preindictment delay. The Supreme Court of Ohio reaffirmed the burden-shifting two-part test: a defendant must first present evidence of actual prejudice; the burden then shifts to the state to show that it has a justifiable reason for the delay. *Id.* at ¶ 13, citing *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998), and *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127.

{¶15} Regarding the first part of the test, the Supreme Court of Ohio cautioned that the determination of actual prejudice involves a delicate, case-by-case consideration of the particular circumstances. *Jones II* at ¶ 20. The courts are to "consider the evidence as it exists when the indictment is filed and the prejudice the defendant will suffer at trial due to the delay." (Citation omitted.) *Id*.

{¶16} The Supreme Court of Ohio stressed that the mere possibility that "memories will fade, witnesses will become inaccessible, or evidence will be lost is not sufficient to establish actual prejudice." (Citation omitted.) *Jones II* at ¶ 21. Nonetheless, the Supreme Court of Ohio rejected the state's argument that "any claim of actual prejudice based on the death of a potential witness is too speculative to succeed unless the defendant can establish precisely what that witness would testify to and that the testimony would be directly exculpatory." *Id*. at ¶ 27. Rather, the courts are to "scrutinize the claim of prejudice vis-à-vis the particular evidence that was lost or unavailable as a result of the delay and, in particular, considered the relevance of the lost

evidence and its purported effect on the defense." *Id.* at ¶ 23, citing *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 52.

{¶17} For a proper analysis of actual prejudice, the Supreme Court of Ohio sought guidance from *State v. Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097 (1984). In that case, defendant Luck was charged with murder 15 years after the victim's death. When arrested 15 years later, Luck told the police that one of the deceased witnesses was with her (Luck) at the time of the murder and he was "the one person who could have helped her in this matter but he was dead." *Luck* at 157. Although there was no evidence establishing what the deceased witness would have actually testified to at trial, the Supreme Court of Ohio found Luck had been actually prejudiced by her *inability to seek verification of her story from the deceased witness*. *Id.* at 158. *See also Jones* at ¶ 28.

{¶18} Citing *Luck*, the Supreme Court of Ohio held in *Jones* that "[a]ctual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *Jones II* at ¶ 28.

{¶19} Turning now to the instant case, we first note that, unlike other crimes of violence, rape cases where consent is the only issue often turns on a credibility contest between the accused and the accuser. In this case, although C.'s sisters were in the house that morning, by both appellee's and C.'s accounts, they were not aware of anything that transpired between C. and appellee. Thus, this case involves a classic "he

said she said" scenario; the newly tested DNA evidence shed no new light on the ultimate question raised by this prosecution. The DNA evidence shows that sexual conduct occurred between appellee and C., which appellee acknowledged to the police from the outset.

{¶20} This is not a case where a defendant, after DNA testing matches him to the crime, makes a self-serving claim that some evidence existed to support his account of the event but the evidence was lost due to the passage of time. Rather, appellee told the police back in 1995, two weeks after the alleged incident, that C. called him twice after midnight, hours before the sexual conduct, to make sure he was coming to her house. Appellee gave the police the specific times of the phone calls, one at 1:00 a.m. and one at 6:10 a.m., *easily able to be verified at the time* by the police through an examination of the phone records in 1995. While the phone records would not show the content of the phone conversations, the *existence* of the phone calls is crucial for the defense because it goes to C.'s credibility — when asked about appellee's presence in her house in the early morning, C. told the police she did not know why he was there. If she were to deny at trial that she had made these phone calls, the defense could have impeached her by the phone records. On the other hand, if she were to admit making the calls, the defense could attempt to impeach her by disproving her prior statement that she did not know why appellee was at her house early in the morning. Moreover, the existence of two phone calls from C. to appellee hours before the sexual conduct, although not direct proof of consent, would help appellee *verify* his account of the event, thereby bolstering the

defense. *Luck* at 157-158; *Jones* at ¶ 28. In particular, due to the 20-year-long delay in prosecuting this matter, what was once eminently verifiable is no longer verifiable today. Appellee's ability to have the police confirm the existence of the phone calls — a most critical piece of evidence in this he-said-she-said case that could corroborate what he said — is, after these two decades, irreparably lost.

{¶21} Applying *Jones II* and balancing the prejudicial factors against the evidence at the time of the indictment, we determine de novo, as the trial court did, that appellee would suffer actual prejudice were he required to stand trial today. Because of the delayed prosecution, appellee no longer had the ability to cross-examine his accuser, impeach her credibility, or to seek verification of his story. The evidence cited by appellee of the specific phone calls from the alleged victim hours before the incident, which could well contradict the victim's account of the event, would certainly minimize the impact of the accuser's testimony and bolster the defense. *Jones II* at ¶ 28. Appellee has demonstrated a "viable, tangible connection" between the lost evidence to the defense of his case. *State v. Richardson*, 8th Dist. Cuyahoga No. 103925, 2016-Ohio-5843, ¶ 13. The prejudice resulting from the lost evidence in this case was not hypothetical or speculative, but actual, as the trial court found.[1]

---

[1] In the *State v. Jones,* 8th Dist. Cuyahoga No. 101258, 2017-Ohio-176 ("*Jones III*"), this court, upon remand from the Supreme Court of Ohio, concluded Jones failed to show actual prejudice. This court reasoned that although Jones claimed his mother, who was present in the house when the incident occurred, was no longer an available witness to testify on his behalf, his brother was also in the house and it is conceivable that his mother's testimony would have been cumulative. For that reason, this court concluded Jones had not shown the loss of his mother as a potential witness would minimize or eliminate the impact of the state's witness and bolster his defense. In contrast, the lost

{¶22} Under the two-part test, the burden then shifted to the state to show that the delay in prosecution was justified. The trial court found no justification "whatsoever" for the delay in the indictment. Indeed, the record reflects the police knew the identity and whereabouts of both appellee and C., whose mother was an employee of the Cleveland Police Department. Both appellee and C. provided a written account of the alleged incident to the police. The file contained a notation that the reports and facts sheets were to be sent to the juvenile court. Yet, nothing was done by the police or prosecution for another 20 years, and by now, 20 years later, appellee was a 37-year-old, and no longer had available to him the juvenile system for the adjudication of the rape allegation. The state did not provide any reason or justification for the delay, and the record reflects none. Under the two-part test reaffirmed by *Jones II*, the trial court properly dismissed the case on the ground of unconstitutional preindictment delay.[2]

---

evidence in this case is not replaceable. Although C.'s sisters were in the house at the time of the sexual conduct, they were, by both C.'s and appellee's accounts, unaware of it. As to the other persons mentioned in C.'s hospital interview (her girlfriend and cousin), they were not present at the time of the alleged offense; further, C.'s girlfriend and cousin were potential witnesses for the state, not for the defense. Therefore, these witnesses' potential availability does not reduce the prejudice appellee would suffer from the lost phone records. As actual prejudice involves a case-by-case consideration of the particular circumstances, *Jones III* is distinguishable.

[2] In *Richardson*, *supra*, this court remanded the preindictment case because the trial court applied the "due process" standard adopted in this court's *Jones I* decision and improperly focused on the length of time of the delay, rather than applying the burden-shifting two-part test. In the instant case, although the hearing over appellee's motion to dismiss for preindictment delay was held on June 6, 2016, before the release of the Supreme Court of Ohio's *Jones* decision, a review of the hearing transcript reflects that the trial court applied the correct burden-shifting two part-test in analyzing whether this case should be dismissed for preindictment delay.

**{¶23}** We emphasize that this is not a case where a rape defendant escapes justice until the DNA evidence matches the defendant to the crime. Unlike the defendant in the *Jones* case, appellee acknowledged sexual conduct with his accuser from the outset. There was never any doubt regarding the source of the semen. This is a he-said-she-said case involving two minors who knew each other, and the police dropped its investigation purposely after interviewing the two minors. Twenty-two years later, it has become impossible for appellee to prove his defense of consent. The Due Process Clause provides a safeguard against prosecuting such a defendant whose right to a fair trial has been actually prejudiced by the unjustifiable indictment delay.

**{¶24}** Appellee also argues that he was prejudiced by the unavailability of the juvenile system for the offense that he allegedly committed when he was a 17-year-old. He argues that, were the case prosecuted in 1995, the law at the time required an amenability hearing before a bindover to the adult court, and, had he been found delinquent, he would have faced at most detention in a juvenile facility until he reached the age of 21. The trial court did not rule on this alternative ground for dismissal, and the state does not address the issue on appeal. We need not reach the issue as it is mooted by our disposition of this matter pursuant to *Jones II*.

**{¶25}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
TIM McCORMACK, PRESIDING JUDGE

MARY J. BOYLE, J., and
SEAN C. GALLAGHER, J., CONCUR