[Cite as *State v. Herns*, 2024-Ohio-1099.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

FRANKLIN CHARLES HERNS,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 23 MA 0055**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 22 CR 445

**BEFORE:**
William A. Klatt, Retired Judge of the Tenth District Court of Appeals,
Sitting by Assignment,
Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Gina DeGenova*, Mahoning County Prosecutor*,* and *Atty. Edward A. Czopur*, Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Lynn A. Maro*, Maro & Schoenike Co., for Defendant-Appellant.

Dated: March 21, 2024

**KLATT, J.**

**{¶1}** Appellant, Franklin Charles Herns, appeals his conviction for one count of rape in violation of R.C. 2907.02(A)(2), a felony of the first degree, following a jury trial in the Mahoning County Court of Common Pleas. He advances two assignments of error. First, Appellant contends the state violated his right to due process due to a pre-indictment delay of nine years. Second, Appellant argues his right to cross-examination was violated based on an alleged directive by the trial court to defense counsel to allow the victim to refresh her recollection. For the following reasons, Appellant's conviction is affirmed.

## FACTS AND PROCEDURAL HISTORY

**{¶2}** Six witnesses testified at trial, all on behalf of the state: (1) W.H., the victim; (2) Officer Chad Zubal, the first police officer dispatched to the scene by Youngstown Police Department ("YPD"); (3) Senka Pavetic, the registered nurse/sexual assault nurse examiner who examined W.H. in the emergency room at St. Elizabeth's Health Center; (4) Officer Shawna-Cie Ott, the YPD officer who transported W.H.'s rape kit to the Bureau of Criminal Investigation ("BCI"); (5) Kylie Graham, the forensic scientist who processed the DNA evidence at BCI; and (6) Detective Sergeant Jessica Shields, the YPD detective who reopened the investigation in 2021.

**{¶3}** The following facts are taken from W.H.'s trial testimony unless otherwise noted. W.H., age eighteen, and Appellant, age twenty, ended a roughly two-year romantic relationship between three and seven days prior to the rape. At the time, W.H. resided with her mother, who rented a single-family home located at 609 W. Boston Avenue on the south side of Youngstown.

**{¶4}** Appellant tried to contact W.H. repeatedly after their parting, but she never responded. More specifically, W.H. testified "[Appellant] would message me and I [did not] want to speak to him * * *." (Trial Tr., p. 285.)

**{¶5}** On the morning of September 5, 2013, W.H. left the door of the W. Boston residence unlocked while she waited for carpet cleaners hired by the landlord to arrive. Uninvited and unannounced, Appellant entered the residence through the unlocked door. W.H. told Appellant to leave, but Appellant ignored her command.

**{¶6}** The couple began arguing and at some point Appellant took W.H.'s mobile telephone for the purpose of determining whether she had "moved on from the relationship." (*Id.*, p. 270.) W.H. testified Appellant walked to the side door to examine the content of the mobile telephone then returned and began accusing her of "doing stuff."

**{¶7}** The verbal argument intensified to physical violence. Appellant grabbed W.H.'s arm then her neck. He choked her, slapped her several times, and punched her in the ribs and face. Appellant grabbed W.H. by the neck and braced her against a wall.

**{¶8}** Next, Appellant pushed W.H. onto a sofa in an adjacent room. Although she struggled to free herself, "kick[ing] and scream[ing] the whole time," Appellant removed W.H.'s pants, removed her underwear, then pulled up her shirt. (*Id.*, p. 276.) While choking her, Appellant inserted his penis in her vagina.

**{¶9}** The rape lasted roughly fifteen minutes, during which Appellant bit her inner thigh just above the knee. Appellant's hand "never left [W.H.'s] neck." (*Id.*, p. 273.)

**{¶10}** Appellant ejaculated, then told W.H. to take a shower. After W.H. showered, Appellant left the residence. According to W.H., physical violence was never a part of their consensual sexual relationship.

**{¶11}** W.H. testified she weighed "98 pounds soaking wet" at the time of the rape. (*Id.*, p. 275.) She estimated Appellant was 6'1 or 6'2 and weighed 200 pounds. Hospital records establish W.H. was 5'8 and weighed 125 pounds. On the day of the rape, W.H. was menstruating.

**{¶12}** When the carpet cleaners arrived, W.H. asked to use one of their mobile telephones to report the rape, as Appellant had retained possession of W.H.'s mobile telephone. The carpet cleaners did not "want to have anything to do with the situation," so W.H. went to the neighbors to use their telephone. When asked at trial if the carpet cleaners were present during the rape, W.H. responded, "I [do not] believe so, no." (*Id.*, p. 277.)

**{¶13}** Officer Zubal was the first YPD officer dispatched to the scene. According to Officer Zubal's testimony, W.H. initially reported a physical assault but subsequently disclosed that Appellant raped her. Officer Zubal attributed W.H.'s failure to immediately report the rape to embarrassment and the discomfort of disclosing the rape to a male stranger.

{¶14} Officer Zubal's report reads in relevant part:

Upon arrival, Officer spoke with [W.H.] who had swelling to the right side of her face/jaw. [W.H.] was having trouble talking and agreed with Officer Zubal that she needed an ambulance to check her injuries. [W.H.] advised that she broke up with [Appellant] approx. (2) weeks earlier after the pair dated for several years. After several minutes [W.H.] advised the Officer that she had been raped.

[W.H.] states the following: The front door was open waiting for Gary Crim employees to come clean the carpet. [Appellant] walked in the front door uninvited. [Appellant] punched her in the face and choked her around the neck. While choking her, [Appellant] pulled her pants down and forced her onto the couch. The couch was located in a small room on the southwest corner of the first floor. [Appellant] penetrated her vaginally while using a condom. Officers checked the home but could not located [sic] the used condom. The two argued for approx. (30) minutes until the Crim employee showed up to clean the carpet. The two argued upstairs for approx. (5) minutes while the carpet cleaner was on the first floor. Crim employee named "Pam" was also present during the incident. [Appellant] asked employee to move his van[,] which was blocking the driveway.

* * *

Several CC neighbors said that [Appellant] is at the house every day, and the two were together earlier in the day. They also said [W.H.'s] mother works during the day and does not approve of her being involved with [Appellant.]

(9/5/13 Incident Rep., p. 2.)

{¶15} Officer Zubal explained at trial that he did not undertake a door-to-door canvas of the neighboring homes. However, he noticed a couple of neighbors standing in

their yards after W.H. was taken by ambulance to the hospital, so he approached them and asked a few questions.

**{¶16}** W.H. testified Appellant did not use a condom during the rape. W.H. further testified she and Appellant did not use condoms during their relationship. When asked on cross-examination if they ever used a condom, she responded, "probably three or four times." (*Id.*, p. 287.) Defense counsel asked, "[b]ut definitely not the fifth?" W.H. responded, "No."

**{¶17}** When asked if there was anything disturbed at the house, for instance – lamps or furniture, W.H. responded, "[t]here was nothing to knock over." (*Id.*, p. 288.) When asked if there might be menstrual blood on the couch, she replied, "[a]gain, I was 98 pounds. Women who are my size [do not] have heavier flows."

**{¶18}** At the hospital, W.H. underwent a physical examination performed by RN/SANE Pavetic. W.H. testified Pavetic "[did not] talk much," and W.H. "just spilled out [her] entire relationship [with Appellant] to [Pavetic.]" (*Id.*, p. 278.)

**{¶19}** Pavetic assembled a rape kit, which included swabs of W.H.'s vagina, anus, mouth, her sanitary pad, and a stain on her underwear. Photographs taken during Pavetic's examination were not in the medical file when the investigation resumed in earnest in 2022.

**{¶20}** According to Pavetic's report, W.H. urinated, defecated, rinsed her mouth, brushed her teeth, and changed her clothes between the rape and the physical examination. Pavetic marked the "yes" box for "condom used by assailant."

**{¶21}** Pavetic testified one of her responsibilities with respect to the rape kit was to transcribe to the best of her ability all of the victim's statements regarding the rape. W.H. provided the following narrative according to Pavetic:

> I was sitting downstairs [with] door open. And he walked in. And he told
> me, he forced me in the car.[1] Then we came back and we were fighting and

---

[1] The state moved to prohibit defense counsel from arguing there were inconsistencies in W.H.'s trial testimony and Pavetic's narrative. Defense counsel explained that he would not specifically refer to the car allegation during his closing argument. The state argued defense counsel was aware the car incident occurred on a different day. Based on W.H.'s testimony that she "spilled out [her] entire relationship [with Appellant] to Pavetic," the state argued W.H.'s reference to the car incident was a part of her recapitulation of the entire relationship. Defense counsel argued

he grabbed my arms. And he grabbed my neck. And he ripped my shirt and he pulled down my pants. I am not sure about condom, but he did and he stuck it in then he stopped and he told me to go upstairs and take a shower. He just sat there for a while and carpet cleaners came and I answered the door. After that we argued for a while and got [physical] again. And asked carpet cleaner to call police and he said he does not want to get involved and I went to my neighbor. And police came 2 hours later.

{¶22} Pavetic relied on her medical notes to refresh her recollection of her examination of W.H. W.H. complained of pain in her back and jaw. Pavetic described W.H.'s emotional status as "sad, poor eye contact, very quiet, flat affect." W.H. reported her last menstrual cycle began on September 2, 2013, three days before the rape.

{¶23} Pavetic described W.H.'s injuries as "on the mouth and face, right inner bottom lip redness with right chin lateral aspect abrasion on the right side of her face." (*Id.*, p. 345.) W.H.'s neck was scratched, her left forearm was red and scratched, and she had a bite above her right knee. A pelvic examination revealed no acute trauma, but for an abrasion on the fossa navicularis (the boat-shaped depression between the vagina/hymen and the frenulum labiorum pudenda). As previously stated, the twenty-five photographs corresponding to a list of items of clothing and injuries in the medical notes could not be located.

{¶24} On September 6, 2013, W.H. was interviewed by Cynthia Carter, a licensed social worker. Carter is an African-American female. Although W.H. testified the Carter interview was recorded, there is no recording of the interview.

{¶25} W.H. testified she did not feel "supported" as she recounted the events of the previous day. W.H. executed a "Victim Refusal to Pursue Charges" form following her interview. The form reads in its entirety:

I, [W.H.], have spoken with M. Brindisi reference [sic] the complaint/investigation I have filed with the Youngstown Police Department

---

there was no evidence in the record supporting the state's argument that the car incident occurred on a different day. The trial court instructed defense counsel to "stay away from what [the state was] asking [defense counsel] to stay away from." (*Id.*, p. 447.)

against <u>Franklin Herns</u>. I have been explained, and fully understand my rights as a victim in this case. I do not wish to pursue the investigation of this case. I have not been threatened, harassed, or promised anything to make this decision. I do this of my own free will.

The form is signed by W.H. and Brindisi and witnessed by "Cynthia J. Carter, LSW."

**{¶26}** According to W.H.'s testimony, she was coerced into signing the form. Specifically, W.H. testified that "[t]wo cornfed Caucasian officers told me, you need to sign this. And being scared and 18 and just having an extremely traumatic experience, no, I [did not] read it. I [did not] understand. I was told to do something by two officers who were extremely intimidating so [that is] what I did. (*Id.*, p. 294.)

**{¶27}** On cross-examination, W.H. conceded Carter was not a Caucasian male. W.H. testified she did not read the form, nor was it explained to her. She further testified she would not have signed the form had the consequences of her signature been fully explained to her. Despite W.H.'s purported lack of knowledge that she declined to pursue charges and the fact that she identified the perpetrator, she never contacted YPD to determine the status of the investigation in the nine years that followed.

**{¶28}** A case cover sheet was completed by Michael Brindisi on the same day. The sheet reads in its entirety:

| | |
|---|---|
| 8:30 am | Drove to the victim's house and made contact with her along with Ofc. Rowley. We drove her to the FISU Office for the purpose of a video interview. Once there [W.H.] appeared to be withdrawn, but still agreed to do the interview. However I felt as though she should first speak with LCW Carter prior to furthering the investigation. Therefore I elicited the help of Ms. Carter who in turn spoke to the victim at length. |
| 11:00 am | In the end, [W.H.] refused to press charges against the suspect. She did sign a Victim Refusal Form and with that I made my way to the Prosecutor's Office. Once there I met with Prosecutor Lantz and reviewed the case. Based on the |

non-cooperation of the victim Ms. Lantz declined prosecution.
I filed a Q&R Form with the Clerk of Courts Office officially
closing the case.

See LCW Carter's case notes for further details.

{¶29} Carter's case notes were not in the criminal file. Further, by 2022, Carter had retired and could not be located.

{¶30} Detective Shields testified at trial that she was reviewing cold cases in 2022 when she discovered the investigative file based on the events of September 5, 2013. The file contained two documents, the case cover sheet and the victim refusal form. Due to Carter's retirement, Detective Shields attempted to recover Carter's interview notes from Carter's file on the YPD database, but there were no notes in Carter's YPD database file.

{¶31} According to Detective Shields, Detective Brindisi should have recorded his conversation with W.H. Detective Shields testified it is common, even when a victim declines to pursue charges, to videotape the victim's statement.

{¶32} Detective Shields further testified that social worker interviews are never recorded, contrary to W.H.'s testimony. Further, Detective Shields characterized Detective Brindisi's notes as "terrible. [They are] bad. * * * This [does not] say anything about where they spent their time." (*Id.*, p. 422.)

{¶33} As a consequence, Detective Shields contacted W.H. through social media. W.H. was a resident of Cleveland, Ohio at the time and a stay-at-home wife and mother of four children. W.H. responded to Detective Shield's inquiry in roughly one hour. After a discussion with Detective Shields, W.H. chose to pursue the case because Detective Shields "actually cared about what was going on with [W.H.], and not only then but [in 2022]." (*Id.*, p. 282.)

{¶34} With respect to the 2022 investigation, Detective Shields conceded she did not interview W.H.'s former neighbors because too much time had elapsed since the alleged crime occurred. She further conceded she did not interview any employees from Gary Crim because the file only contained the first name "Pam." Detective Shields

blamed Detective Brindisi for the failure to investigate in the days following the alleged crime.

**{¶35}** The real story behind the reopening of the case is described in the state's opposition brief to Appellant's motion to dismiss filed on January 27, 2023. According to the state's response filed on February 14, 2023, W.H.'s rape kit was processed on May 24, 2018. BCI identified unknown male DNA sufficient for comparison from the swab of W.H.'s underwear.

**{¶36}** In July of 2021, a second accuser claimed that she was sexually assaulted by Appellant. Appellant's DNA was obtained during the investigation of the new case[2] and was cross-referenced with W.H.'s rape kit. Appellant's DNA matched the sperm fraction found in the swab of W.H.'s underwear. Detective Shields contacted W.H., who gave her account of the alleged sexual assault. As a result, Appellant was indicted for one count of rape on August 11, 2022.

**{¶37}** At trial, Graham, the forensic scientist from BCI, conceded no DNA profile foreign to W.H. was found in the vaginal and perianal samples. The oral samples were not examined.

**{¶38}** However, the swab of the stain in W.H.'s underwear was consistent with contributions from W.H. and Appellant. The estimated frequency of occurrence of the DNA profile in the sperm fraction is rarer than 1 in 1 trillion unrelated individuals. The swab of the sanitary pad contained a mixture of contributions from W.H. and an unknown male, however the quality of the unknown male DNA was not sufficient for comparison.

**{¶39}** With respect to the dried stain on the underwear, Graham testified:

> A dried stain on an item of clothing can last for a long time. It could be there
> for days, for weeks, for months. Any sort of cleaning or laundering may
> reduce the amount of sample or DNA that would be obtained from any future
> testing. I [cannot] put a timeframe on DNA [that is] recovered from any item
> of clothing.

---

[2] Appellant was convicted of the 2021 rape in 22 CR 00148. A motion in limine precluded the introduction of Appellant's conviction during the trial in the above-captioned case. We affirmed Appellant's conviction for the 2021 rape last year in *State v. Herns*, 7th Dist. Mahoning No. 22 MA 0109, 2023-Ohio-4714.

(*Id.*, p. 397.)

**{¶40}** Graham conceded it is possible for a dried stain to survive a laundry cycle depending on the amount of biological material deposited on the garment, the type of cleaning, and "how well it was washed." Graham opined, "[there are] a lot of variables there so I [cannot] say with certainty that laundering once would remove anything that would be detectable by future testing."

**{¶41}** During closing argument, defense counsel conceded that Appellant assaulted W.H., then argued the rape charge was W.H.'s retribution. Defense counsel relied on W.H.'s failure to immediately report the rape to Officer Zubal, and her conflicting statements regarding Appellant's use of a condom to show the rape accusation was false. Defense counsel argued that W.H. changed her story because no condom was found at the W. Boston residence.

**{¶42}** Appellant was convicted on the sole count in the indictment. He was sentenced to eleven years to be served consecutively to the sentence for his previous rape conviction. This timely appeal followed.

**{¶43}** It is important to note that Detective Shields conducted a videotaped interview of W.H. on July 26, 2022. Defense counsel attempted to use the transcript of the interview, identified as Defense Exhibit 1 at trial, during cross-examination to impeach W.H. based on self-contradiction. However, defense counsel withdrew Defense Exhibit 1 after the close of evidence, so it is not a part of the record on appeal.

## ASSIGNMENT OF ERROR NO. 1

**A 10 YEAR DELAY IN THE PROSECUTION WHICH RESULTS IN LOST AND DESTROYED EVIDENCE, WHEN THE STATE HAS NO NEW EVIDENCE AND NO REASONABLE JUSTIFICATION FOR THE DELAY VIOLATES THE RIGHTS AND LIBERTIES PROTECTED BY THE U.S. CONST., AMEND. VI AND XIV AND OHIO CONST., ART. I, §§ 1, 2, 5, 10 AND 16 WHEN THE TRIAL COURT OVERRULED [APPELLANT'S] MOTION FOR DISCHARGE PREMISED UPON PRE-INDICTMENT DELAY.**

**{¶44}** The statute of limitations for a criminal offense is the defendant's primary protection against overly stale criminal charges. *U.S. v. Marion*, 404 U.S. 307, 322, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). However, the Due Process Clause of the Fifth Amendment provides additional protection in cases where the preindictment delay was unjustifiable and caused actual prejudice. *U.S. v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). In reviewing a motion to dismiss for preindictment delay, we apply the de novo standard of review to issues of law, but afford great deference to a trial court's findings of fact. *State v. Craig*, 10th Dist. Franklin No. 22AP-215, 2023-Ohio-1003, ¶ 16; *State v. Porter*, 3d Dist. Allen No. 1-21-01, 2021-Ohio-2539, ¶ 7; *State v. McKinley*, 8th Dist. Cuyahoga No. 108715, 2020-Ohio-3664, ¶ 31-32; *State v. Adkins*, 6th Dist. Wood No. WD-16-042, 2018-Ohio-2588, ¶ 11; *State v. Hawkins*, 2d Dist. Montgomery No. 27019, 2018-Ohio-867, ¶ 37. A court of appeals will accept a trial court's findings of fact if they are supported by competent, credible evidence. *McKinley* at ¶ 32.

**{¶45}** The Ohio Supreme Court has established a burden-shifting framework for analyzing preindictment delay due process claims. *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998). Under this framework, a defendant is first required to present evidence of actual prejudice; if actual prejudice is established, the burden shifts to the state to produce evidence of a justifiable reason for the delay. *Id.*

**{¶46}** The Ohio Supreme Court has held "the determination of 'actual prejudice' involves 'a delicate judgment based on the circumstances of each case.' " *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 52, citing *Marion, supra,* at 326. An actual prejudice analysis requires courts to undertake a case-by-case consideration of the relevance of the lost evidence and its purported effect on the defense. *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 105, citing *Walls* at ¶ 52.

**{¶47}** The mere "possibility that memories will fade, witnesses will become inaccessible, or evidence will be lost is not sufficient to establish actual prejudice," as those are manifestations of the prejudice inherent in any delay. *Adams* at ¶ 105, citing *Marion, supra,* at 326. Moreover, "[t]he law requires a defendant to do more than offer mere speculation as to how he [or she] was prejudiced by any delay because requiring less would undermine the statute of limitations." *State v. Clark*, 8th Dist. Cuyahoga No. 103324, 2016-Ohio-4561.

**{¶48}** "Actual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 28, citing *State v. Luck*, 15 Ohio St.3d 150, 157-158472 N.E.2d 1097 (1984). The Ohio Supreme Court has acknowledged "the burden upon a defendant seeking to prove that preindictment delay violated due process is ' "nearly insurmountable," ' especially because proof of prejudice is always speculative." *Adams, supra,* at ¶ 100, quoting *United States v. Montgomery*, 491 Fed.Appx. 683, 691 (6th Cir.2012), quoting *United States v. Rogers*, 118 F.3d 466, 475 (6th Cir.1997).

**{¶49}** A defendant is not required to establish "precisely" what an unavailable witness would have testified to at trial and that the testimony would have been directly exculpatory. *Jones*, *supra*, at ¶ 27. A defendant must nonetheless demonstrate a viable, tangible connection between the missing evidence or the unavailable witness to the defense of the case. *State v. Richardson*, 2016-Ohio-5843, 70 N.E.3d 1175 (8th Dist.). The due process requirement of actual prejudice may be shown upon "the proven unavailability of specific evidence or testimony that would attack the credibility or weight of the state's evidence against a defendant, and thereby aid in establishing a defense." *Jones* at ¶ 25.

**{¶50}** The Eighth District has held the defense cannot establish actual prejudice by merely stating that a witness cannot be found. In *State v. Walker*, 8th Dist. Cuyahoga No. 106414, 2018-Ohio-3669, the Eighth District found no actual prejudice where there was no evidence or explanation in the record as to the effort made by the defense to find the missing witnesses. The Eighth District opined:

> The record is silent as to whether counsel conducted an internet search, engaged the services of an investigator, contacted [the lead detective's] former employer, the Cleveland Police Department, or made any other attempts to find these witnesses.
>
> * * *

In order to establish actual prejudice caused by the unavailability of witnesses, the defendant must first prove that the witnesses are in fact unavailable. A defendant's bald assertion that witnesses are unavailable because they cannot be found is not sufficient to establish the unavailability of the witnesses. There must be some explanation of the efforts the defendant made to find them. And the trial court must make a determination as to whether the attempts made to find missing witnesses were sufficient to justify the conclusion of unavailability. Moreover, the record should include evidence of the attempts made to locate missing witnesses so that the appellate court can accurately assess the trial court's judgment.

*Walker* at ¶ 19-20.

**{¶51}** Finally, any claim of prejudice by a defendant must be balanced against the other evidence in order to determine whether actual prejudice will impact the defendant at trial. *State v. Luck*, 15 Ohio St.3d 150, 154, 472 N.E.2d 1097, 1102 (1984). A court will not presume prejudice merely because the delay exceeds a particular length of time. *Adams*, *supra, a*t ¶ 98.

**{¶52}** Where actual prejudice is shown, the state must prove the preindictment delay was justified. A delay may be unjustifiable when it is intentionally undertaken for the purpose of gaining a tactical advantage over the defendant. *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). In Ohio, a delay may likewise be unjustifiable when the state, through negligence or an error in judgment, effectively ceases the active investigation of a case, but later decides to commence prosecution upon the same evidence that was available to it at the time that its active investigation was ceased. *Luck*, *supra*, at 158. The length of delay will normally be the key factor in determining whether a delay caused by negligence or error in judgment is justifiable. *Id.*

**{¶53}** Appellant predicated his motion to dismiss on the missing telephone records following the couple's estrangement and the inability to locate witnesses from the day of the alleged crime to demonstrate that he suffered actual prejudice. Appellant argued the missing telephone messages would establish he was invited by W.H. to the residence on the day of the alleged crime to reconcile. He further argued the neighbors' testimony

would establish that he was at the residence every day following the break-up, including the morning of the alleged crime, contrary to W.H.'s testimony that she did not want to speak to him following their parting. Finally, Appellant argued W.H. conceded that "Pam" and another employee from Gary Crim were present in the residence following the rape and during the post-rape argument, and their testimony would have contradicted W.H.'s accusations.

**{¶54}** Appellant argued the prejudice he suffered is magnified due to various contradictions in W.H.'s story as it was recounted over time. For instance, W.H. reported Appellant wore a condom to Officer Zubal in 2013, but was not certain several hours later during the preparation of the rape kit. Appellant argued the inconsistencies in W.H.'s story, coupled with the fact that W.H. executed a refusal to prosecute form that halted the investigation, further demonstrates the missing evidence and witnesses resulted in actual prejudice.

**{¶55}** Appellant asserted the facts in this case are analogous to the facts in *State v. Kafantaris*, 2018-Ohio-1397, 110 N.E.3d 793 (8th Dist.). In *Kafantaris*, the victim reported the alleged rape to law enforcement in 1996, identified Kafantaris as the perpetrator, and further accused him of telephoning her repeatedly after the rape and threatening her should she pursue charges against him. Shortly thereafter, the victim declined to prosecute because she believed the rape was in some part attributable to her own irresponsible behavior.

**{¶56}** The case was closed and marked "exceptional cleanup." The rape kit was processed in 2013, Kafantaris's DNA was collected in 2016, and he was indicted a few months later.

**{¶57}** The Eighth District affirmed the trial court's decision sustaining Kafantaris's motion to dismiss based on the unavailability of telephone records. The Eighth District reasoned evidence that no telephone calls were made by Kafantaris (as he alleged), would have directly contradicted the victim's testimony regarding Kafantaris's alleged post-rape threats. The Eighth District predicated its actual prejudice determination in the case on the purported non-existence of the telephone calls (a verifiable fact), as opposed to reliance on their content (which would be speculative). *See also*, *State v. Crymes*, 8th Dist. Cuyahoga No. 104705, 2017-Ohio-2655 (victim testified the defendant appeared

Case No. 23 MA 0055

unannounced at her residence, but defendant claimed the victim called him twice that day to invite him to her home).

**{¶58}** The trial court in the above-captioned appeal did not conduct a hearing on the motion to dismiss. The trial court summarily overruled the motion in a one-sentence judgment entry on March 6, 2023.

**{¶59}** The motion was renewed at trial. Taking the offensive, the state argued that the missing pictures from the rape kit prejudiced the state rather than Appellant. However, the trial court observed that testimony regarding W.H.'s injuries was offered by Pavetic, so the state suffered no prejudice.

**{¶60}** The trial court again overruled the motion stating:

> Every prosecution is not perfect and [you are] not going to be able to call every witness. They worked with what they have. They called who they had. You had an opportunity to confront those witnesses and cross examine them. The state did not appear to withhold any evidence at all. They gave you everything that they have prior to this trial through the discovery process. So, I mean, I think that the defense has had every opportunity as well to attempt to track down the witnesses the defense wanted to present.
>
> And, as such, I am going to make a finding that the defendant was not prejudiced by the evidence that was said that was – I guess, spoliated, I suppose. So as such [I am] going to overrule your motion.

(*Id.*, p. 433-434.)

**{¶61}** Appellant's burden is to establish the missing evidence and unavailable testimony is relevant to the defense and would minimize or eliminate the impact of the state's evidence and bolster the defense. *Jones* at ¶ 28, citing *State v. Luck*, at 157-158. As previously stated, the record contains evidence that: (1) Appellant messaged W.H. regularly during their estrangement; (2) W.H.'s neighbors observed Appellant was a daily presence at the W. Boston address even after the couple ended their romantic relationship; and (3) Carter's notes could contradict W.H.'s testimony that she was coerced into declining prosecution.

{¶62} In order to conclude the foregoing evidence is relevant, and would minimize or eliminate the impact of W.H.'s testimony, or bolster the defense, we must engage in speculation. Unlike the telephone messages in *Kafantaris, supra,* the mere existence of the telephone messages in this case would not contravene W.H.'s testimony. In order to conclude the telephone messages are relevant, we would have to speculate that W.H. engaged in friendly exchanges with Appellant. Likewise, Appellant's reliance on the neighbors' observations presupposes that he was an invited guest, rather than an interloper. In other words, the telephone messages and the neighbors' observations, without speculation, do not constitute evidence of actual prejudice. Further, there is no evidence in the record to support Appellant's conclusion that Carter's notes would contravene W.H.'s testimony that she was coerced into declining prosecution.

{¶63} Of equal import, there is no evidence in the record to establish defense counsel's efforts to locate Carter or W.H.'s former neighbors. Appellant relies on conclusory statements that the witnesses could not be located. However, the defendant carries the burden of proof with respect to a witness's unavailability, and the defendant must offer evidence regarding his inability to find a witness.

{¶64} Finally, other evidence in the record contravenes Appellant's argument that the telephone messages and his daily visits to W.H.'s residence would demonstrate that he and W.H. were planning to reconcile. Defense counsel conceded during closing argument that Appellant physically assaulted W.H., which is directly at odds with Appellant's argument that the couple had resumed their romantic relationship.

{¶65} Accordingly, we find Appellant has failed to demonstrate that he suffered actual prejudice as a consequence of preindictment delay. Therefore, Appellant's first assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING [APPELLANT] THE RIGHT OF CONFRONTATION DURING CROSS EXAMINATION, DIRECTING COUNSEL TO REFRESH THE WITNESSES [SIC] RECOLLECTION.**

{¶66} Defense counsel must be given "wide latitude" on cross-examination and must be allowed "as complete a cross-examination as reasonably possible of witnesses identifying the defendant as the perpetrator of the crime." *State v. Hannah,* 54 Ohio St.2d 84, 88, 374 N.E.2d 1359 (1978). Any abrogation of the defendant's right to a full and complete cross-examination of such witnesses is a denial of a fundamental right essential to a fair trial and is prejudicial per se. There are limits, however, and "the limits to which a witness may be cross-examined are within the sound discretion of the trial court." *State v. Woodard*, 68 Ohio St.3d 70, 74, 623 N.E.2d 75 (1993).

{¶67} Evid.R. 613 governs impeachment by self-contradiction and reads in relevant part:

(A) Examining Witness Concerning Prior Statement. In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.

Ohio Evid. R. 613.

{¶68} Appellant argues in his brief that the "defense attempted to impeach W.H. with prior statements she made ten years earlier. * * * The [state] objected to a leading question regarding prior documents or statements by W.H. The trial court instructed trial counsel to refresh W.H.'s recollection." (Appellant's Brf., p. 15.)

{¶69} Appellant relies on the following exchange during W.H.'s cross-examination to demonstrate the alleged violation of his right to cross-examination:

DEFENSE COUNSEL: All right. Now, you said this sexual assault ended when [Appellant] ejaculated; correct?

W.H.: Yes.

DEFENSE COUNSEL: Where did he ejaculate?

W.H.: Inside of me.

DEFENSE COUNSEL: Inside of your vagina?

W.H.:  Yes.

DEFENSE COUNSEL:  Okay. Was your mom home at the time of this incident?

W.H.:  No.

DEFENSE COUNSEL:  No? You testified that you did not consent to the sexual encounter here today; correct?

W.H.:  Yes.

DEFENSE COUNSEL:  Okay. Do you recall –

And [I am] going to mark this as Defendant's Exhibit 1.

(WHEREUPON, Defendant's Exhibit No. 1 was identified for the record.)

PROSECUTOR:  Your Honor, the state would object. Can we approach?

(WHEREUPON, a discussion was had among court and counsel off the record and out of the hearing of the jury and court reporter, after which the proceedings continued as follows:)

DEFENSE COUNSEL:  Do you recall if [Appellant] asked you to have sex or if he told you you were having sex?

W.H.:  No.

DEFENSE COUNSEL:  You [do not] recall?

W.H.:  No.

DEFENSE COUNSEL:  Do you recall answering that question to Detective Shields?

W.H.:  No.

DEFENSE COUNSEL:  All right. If I showed you your statement –

| | |
|---|---|
| PROSECUTOR: | Objection, Your Honor. |
| W.H.: | That [will not] make me remember anything. |
| PROSECUTOR: | [That is] exactly – |
| PROSECUTOR NO. 2: | She said that exactly in her statement. [That is] what she said. |
| THE COURT: | Just go ahead and ask the question. |
| DEFENSE COUNSEL: | Would anything refresh your recollection? |
| W.H.: | No. |
| DEFENSE COUNSEL: | Okay. Do you remember telling Detective Shields that you were fighting with [Appellant] so [you are] sure there [was not] an asking? |
| W.H.: | Nope. |
| DEFENSE COUNSEL: | Okay. So [it is] your testimony that you [cannot] remember if [Appellant] asked you to have sex; correct? |
| W.H.: | My testimony is that I [do not] remember that conversation with Detective Shields. |
| DEFENSE COUNSEL: | Okay. So how about my question, do you remember if [Appellant] asked you to have sex? |
| W.H.: | We [would not] be here if he did. |
| DEFENSE COUNSEL: | Well, you testified that you [cannot] remember if he asked you. |
| W.H.: | I testified that I [do not] remember a conversation between myself and Detective |

Shields.

DEFENSE COUNSEL: All right. Would anything refresh your recollection?

W.H.: No.

PROSECUTOR NO. 2: Your Honor, may we approach?

(WHEREUPON, a discussion was had among court and counsel off the record and out of the hearing of the jury and court reporter, after which the proceedings continued as follows:)

THE COURT: Sustained.

DEFENSE COUNSEL: Do you recall telling the detective that [Appellant] used a condom?

W.H.: No.

(Trial Tr., p. 289-292.)

**{¶70}** Two procedural issues prevent us from reaching the merits of the second assignment of error. First, Defense Exhibit 1 was withdrawn and is not a part of the record. In the absence of any evidence of self-contradiction, we are unable to determine that Appellant's constitutional right to cross-examination was violated based on the record.

**{¶71}** Second, the two sidebar conferences with the trial court during the testimony at issue were not transcribed, so there is no evidence in the record that the trial court instructed trial counsel to refresh W.H.'s recollection. Although Crim.R. 22 requires the recording of sidebar conferences in serious-offense cases, defense counsel did not object to the trial court's failure to record the sidebar conferences. See *State v. Goodwin*, 84 Ohio St.3d 331, 340, 1999-Ohio-356, 703 N.E.2d 1251 (1999) (Goodwin waived any possible error because no pretrial motion was made to record all sidebars and his counsel did not request that the pretrials and sidebars be recorded).

**{¶72}** In the absence of evidence of self-contradiction or instruction by the trial court to defense counsel to refresh W.H.'s recollection, we cannot conclude Appellant's

right to cross-examination was violated. Accordingly, the second assignment of error is unsupported by the record and has no merit.

## CONCLUSION

**{¶73}** For the foregoing reasons, Appellant's conviction is affirmed.


Waite, J., concurs.

Robb, P.J., concurs.

[Cite as *State v. Herns*, 2024-Ohio-1099.]

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**