[Cite as *State v. Jones*, 2024-Ohio-1588.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,              :                    No. 113082

    v.                                          :

DARRYL JONES,                            :

    Defendant-Appellant.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 25, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-652722-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Shannon M. Musson, Assistant Prosecuting Attorney, *for appellee.*

Allison S. Breneman, *for appellant.*

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant, Darryl Jones, appeals his convictions for rape and kidnapping following a jury trial. He contends that his convictions were not supported by sufficient evidence and were against the manifest weight of the

evidence. He also contends that the trial court erred in failing to dismiss the case due to preindictment delay. For the reasons that follow, we affirm.

**Factual Background and Procedural History**

{¶ 2} On September 22, 2020, a Cuyahoga County Grand Jury indicted Jones on three counts: (1) one count of rape in violation of R.C. 2907.02(A)(2), with notices of prior conviction pursuant to R.C. 2929.13(F)(6) and repeat violent offender specifications pursuant to R.C. 2941.149(A); (2) one count of gross sexual imposition in violation of R.C. 2907.05(A)(1) and (3) one count of kidnapping in violation of R.C. 2905.01(A)(4), with notices of prior conviction pursuant to R.C. 2929.13(F)(6), repeat violent offender specifications pursuant to R.C. 2941.149(A) and a sexual motivation specification pursuant to R.C. 2941.147(A). The charges related to Jones' alleged sexual assault of T.G. on October 25, 2004 in East Cleveland.

### Pretrial Motion to Dismiss Due to Preindictment Delay

{¶ 3} On September 30, 2021, Jones filed a "motion to dismiss with prejudice for unconstitutional pre-indictment delay." Jones argued that the state's delay of nearly 16 years in prosecuting the case violated his rights under Article I, Section 16 of the Ohio Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. He argued that his defense was "significantly impaired and prejudiced" because "a great deal of evidence was either never investigated or is no longer available for review and testing." Specifically, Jones claimed he was prejudiced by (1) the loss of the recording of a 911 call and photographs of T.G.'s

alleged injuries; (2) the inability to identify and locate witnesses, including a man who allegedly assisted T.G. following the incident, police officers and detectives in the East Cleveland Police Department to whom T.G. reported the incident and "hospital personnel that examined and interviewed" T.G.; (3) memory loss by other witnesses, including memory loss by T.G.'s adoptive mother following a brain tumor and "critical" "change[s]" in T.G's "version" of events from 2004 to 2020; and (4) the death of two witnesses, Harvey Randall and Dianne Wynn, who Jones claimed could have corroborated his version of events, i.e., that he and T.G. had had "consensual sex for money." Jones submitted no affidavits or other evidence in support of his motion.

{¶ 4} The state opposed the motion, arguing that Jones had failed to establish that he had suffered "actual, substantial prejudice" as a result of the delay and that the delay in prosecution was justified, i.e., the case involved an alleged rape by a stranger who had not been identified and the investigation "came back to light once there was DNA evidence matching the defendant." The state did not submit any evidence in support of its opposition.

{¶ 5} On April 12, 2022, the trial court held a hearing on the motion. At the hearing on the motion, once again, the parties presented no witness testimony or other evidence. Counsel merely argued for, and against, the motion to dismiss. Jones' counsel argued that Jones was prejudiced by the state's almost 16-year delay in prosecuting him for the reasons set forth in his motion, in particular because T.G.'s adoptive mother, G.G., who had allegedly taken T.G. to the hospital, had

suffered memory loss following a brain tumor and "two independent witnesses, who were there, at the scene, who would have been able to have said it was consensual sex for money" were now deceased. Jones further argued that there was no justifiable reason for the delay, noting that even after receiving a CODIS hit for Jones in 2015, the state did nothing to prosecute Jones for several years.

{¶ 6} In response, the state argued that Jones had not met his burden of establishing that he was actually prejudiced by the delay in prosecution and that, because "no witnesses [had] been called" at the hearing, there was no evidence for the trial court "to really consider at this point." Addressing each of the items of allegedly lost evidence identified by Jones, the state indicated that Harvey Randall was not identified in the police report[1] and that its investigator had located only one Harvey Randall in the state of Ohio, i.e., a 60-year-old white male who lives in the Akron area and "appears to be alive." The state acknowledged that "the one woman who is listed in the police report" was deceased but that she had only stated that "she heard a noise, she didn't observe anything" and that Jones' claim that he had had consensual sex with T.G. for money was inconsistent with what he told the investigator initially, i.e., that he had never met T.G. before, that "his DNA would never be in her kit" and that he had not been to East Cleveland since he had graduated from high school. The state acknowledged that it had been unable to locate the man who had allegedly picked up T.G. following the assault, but noted

---

[1] The police report was not submitted with the parties' briefs on the motion to dismiss and, based on the transcript of the hearing, it does not appear that it was introduced into evidence at the hearing.

that he was not an eyewitness to the incident. The state also acknowledged that any recordings of 911 calls would have been destroyed because they were retained for only seven years and that the photographs taken of T.G. at the hospital had not been located. The state indicated, however, that T.G.'s "medical records" and sexual-assault kit notes were available and that these were "fairly descriptive of the injuries that were in fact photographed." The state further acknowledged that G.G. had sustained memory loss due to a brain tumor but indicated that she did recall that "something terrible" had happened to T.G. and that she had "assisted her in getting to the hospital."[2] The state indicated that both the East Cleveland police officer who took T.G.'s report and the sexual assault nurse examiner ("SANE nurse") who examined and interviewed T.G. had been located and were available for trial. The state asserted that to the extent Jones claimed T.G. had "changed her story" from 2004 to 2022, Jones was free to cross-examine T.G. regarding what she had said previously and what she recalled at the time of trial.

{¶ 7} The state also attempted to explain the delay in prosecution and asserted that it did not delay the prosecution "deliberately for any kind of tactical advantage." The state noted that Jones was a stranger to T.G., that the state did not know his identity in 2004 when the rape was initially reported and that it was not until 2015, when the state received a CODIS hit on DNA samples in T.G.'s sexual-assault evidence collection kit ("sexual-assault kit"), that Jones was identified. The

---

[2] The state's assertion that G.G. assisted T.G. in getting to the hospital is inconsistent with T.G. and G.G.'s trial testimony. As indicated below, T.G. testified that an ambulance took her to the hospital and G.G. testified that she met T.G. at the hospital.

state indicated that T.G.'s sexual assault kit was one of 7,000 kits discovered when the Cuyahoga County Sexual Assault Kit Task Force was started in 2011, that cases were necessarily prioritized, that, in 2017, a new investigator began looking into the case, that that investigator was reassigned and that Christy Kernik was thereafter assigned to the case and contacted T.G. According to the state, investigators had made efforts to locate Jones before his indictment but were unsuccessful and that it was not until June 30, 2021, after Jones was indicted and brought into custody, that Kernik first spoke with Jones. The state could provide little explanation for the five-year delay between the identification of Jones in 2015 and his indictment in 2020, other than to state that there was prioritization of cases within the department and that "we were investigating the case, trying to put all the pieces together."

{¶ 8} On April 20, 2022, the trial court summarily denied Jones' motion to dismiss.

**The Trial**

{¶ 9} The case proceeded to trial on May 31, 2023. Jones waived a jury trial on the notices of prior conviction and repeat violent offender specifications. The remaining charges were tried to a jury.

{¶ 10} Eight witnesses testified on behalf of the state at trial, including T.G., G.G., the SANE nurse who conducted a sexual assault examination of T.G. following the incident, the retired East Cleveland Police Officer to whom T.G. reported the incident, investigators involved in the continued investigation of the incident in 2020 and the forensic scientist who performed DNA analysis of the samples

collected in T.G.'s sexual assault kit.  No witnesses testified for the defense.  A brief summary of the relevant evidence presented at trial follows.

{¶ 11} T.G. testified that on the evening of October 24, 2004, when she was 22, she went to a bar in Cleveland Heights and drank tequila and beer until she was "buzzed."  She stated that she "definitely smoked weed" that day and also likely used cocaine.  She testified that, at closing time, during the early morning hours of October 25, 2004, the bouncer, whom she knew, offered her a ride home and T.G. accepted.  As they were driving in the car, the bouncer began "making passes" at T.G. and "being very pushy."  T.G. stated that she became "uncomfortable" and asked him to pull over.  He did so, and T.G. got out of the car, intending to walk the rest of the way home, approximately a mile or two.

{¶ 12} T.G. testified that she began walking home at approximately 3:00 a.m. She stated that it was dark and that, at first, there was no one around.  T.G. testified that she had a cigarette, but no lighter, and really wanted to smoke.  As she was walking, she saw a man she did not know.  She described him as "taller than [her], stocky, kind of like beefy" and that he "[d]idn't seem like a threat."   She asked him if he had a lighter and he told her to follow him to his house.  T.G. walked with the man to get a lighter and the two then sat on his front steps, talking, "socializ[ing]." She stated that, after a while, she began getting "negative, bad" vibes from the man and "wasn't liking what he was saying because it was angry and aggressive towards wom[e]n," so she attempted to leave.

{¶ 13} T.G. testified that when she attempted to leave, the man "grabbed [her] up," "yanked" her and "drug [her] down in between two houses" into a dark alleyway. She stated that she was "scared" and was "resisting him," "fighting him," trying to get away, but that she could not escape because he was "a lot bigger than me."

{¶ 14} T.G. stated that as the man pulled her "away from the street," someone turned a light on and then off in one of the nearby buildings, but that when they reached the rear of the property, "[i]t was just me and him back there."

{¶ 15} T.G. testified that the man "threw [her] down," forcing her to the ground, then took her head and "started slamming it against [the] ground" into the concrete. T.G. stated that, as she was struggling, her glasses fell off and were scraped on the lens. She said that she "tried her best" to resist but that the man was "so beefy and thick," "like a brick wall," there was "nothing [she] could do" to get him off her, "so [she] just stopped resisting and waited it out."

{¶ 16} T.G. stated that the man took off her pants and raped her vaginally. She testified that she did not consent to having sex with the man. She stated that she did not approach the man to buy drugs from him and did not offer to exchange sex for drugs. She testified that she told the man, "No," "multiple times." When asked whether she wanted to have sex with her assailant, she replied, "Absolutely not. I just wanted a lighter."

{¶ 17} T.G. testified that, after the assault, her assailant pulled up her pants, and she left. T.G. stated that the next thing she recalled, she was in "daylight,"

walking "aimlessly," "in a haze" when a car pulled up alongside her, driven by a black male. She testified that the man offered to assist her and "take [her] to get some help." T.G. indicated that after she saw his "credentials," indicating that he was a nurse, she got into his car and he drove her to a clinic. She stated that she was then taken by ambulance to the hospital, where a sexual assault examination was performed and a sexual assault kit was collected.

{¶ 18} T.G. stated that, at the hospital, she spoke with a SANE nurse and told her what had happened. She stated that when she undressed for the sexual assault examination, "there was like a ton of gravel that had fallen out of my clothes and off of me from on the ground." She described the collection of evidence by the SANE nurse as "violating" and "[h]orrible" and that she "didn't want any of that to happen." She stated that both her adoptive mother, G.G., and her biological mother were at the hospital with her. After T.G. left the hospital, she and G.G. went to the East Cleveland police station, where T.G. filed a report, answered questions and gave a statement to one of the officers. The police then accompanied T.G. and G.G. back to the scene of the incident. T.G. indicated that she told the officer that her assailant was a man named "Ron," who was in his thirties, 5′10″ and 180 pounds.

{¶ 19} T.G. testified that the police later had her "come in and look at some lineups, photo items of people's mug shots * * * to see if [she] could find [her assailant]," but that there were "tons" of photos and she never found him. T.G. stated that the East Cleveland police never contacted her again about the incident

and that she did not follow up with them herself because she "just wanted to forget about it" and "just tried to block it out like it didn't happen."

{¶ 20} T.G. testified that, in 2020, an investigator reached out her and informed her that they were continuing to investigate the incident. She then met with the investigator, the assistant prosecutor, an advocate and "another lady." T.G. stated that she was asked to view a photo lineup of potential suspects. She indicated that one of the men in the photo lineup "had the features [she] remembered" but that she was not sure it was her assailant and ultimately decided not to make an identification because she "didn't want to do something [she] wasn't [a] hundred percent positive about." Timothy Brown, an investigator in the Cuyahoga County Prosecutor's Office, testified that a photograph of Jones was included in the photo lineup shown to T.G.

{¶ 21} T.G. admitted that she had been convicted of theft in 2010 and of misuse of a credit card in 2011. She stated that both convictions related to offenses involving her mother, i.e., theft of her mother's cell phone and unauthorized use of her mother's debit card.

{¶ 22} G.G., T.G.'s adoptive mother, testified that she had had a brain tumor in 2019 and that, as a result, she sometimes experiences memory loss. She stated that she remembered receiving a call, at some point, that T.G. had been assaulted and was in the hospital. She indicated that she went to see T.G. at the hospital and that T.G. was "kind of beat up," with bruises and scratches on her face. G.G. testified that after she and T.G. left the hospital, they drove to East Cleveland and T.G.

showed her where she had been taken and dragged behind a house. G.G. stated that she recalled little else regarding the incident.

{¶ 23} Jo Ann Podlogar, a nurse, examined T.G. on October 25, 2004, following the incident, and collected information and evidence for T.G.'s sexual assault kit. Based on her review of the sexual assault kit notes she had made during her examination of T.G., Podlogar testified that T.G. had reported that she had been assaulted by a male stranger who had vaginally penetrated her and licked her breasts. Podlogar then read the narrative description — which Podlogar had recorded verbatim — of what T.G. had said occurred, to the jury:

> After leaving a bar in Cleveland Heights near Cedar and Lee I walked towards Mayfield Road to catch a bus to my mother's house. The bus was — the bars were closing, so it was after 2:30 in the morning. I walked down Superior and cut through an apartment building, and I remember * * * ending up by a bank in a Taco Bell type building. I was walking down the street, and I asked this dude to borrow his lighter. I walked with him and talked with him. We went to a light colored duplex and sat on the porch.
>
> The next thing I knew he was getting pushy and ignorant. He used sexual language. And was pushing me. Next thing I knew, he dragged me down the driveway. He threw me on the ground, ripped off my pants and shoved up my shirt.
>
> He hit my head on the ground repeatedly. He banged my head against the ground. He had his hand over my mouth and throat, and I bit him on the hand.
>
> I broke my nails on his skin. He finished what he wanted to do. He got up off of me and helped me put my pants back on. I was crying.
>
> I dressed and walked down the driveway. He was yelling vulgar obscenities to me.

I ran down the street and got away. I was hysterical. A man saw me and drove slowly in his car and asked if I was okay.

I was afraid. He reassured me because he worked for a clinic. He drove me to the clinic and back to where the assault happened.

Then I went back to the clinic, and I told one of the nurses I was raped, and the clinic staff called EMS.

{¶ 24} Podlogar testified that, based on a visual examination, she observed that T.G. had abrasions to her right cheek and above her left eye, abrasions on both breasts, scratches linearly across her upper right thigh, bruises on her hands and her left posterior arm and abrasions to the sacrococcyx area. Podlogar stated that she took Polaroid photos of T.G.'s injuries, then proceeded to the "intimate exam," where swabs of samples were collected for the sexual assault kit. She indicated that T.G.'s clothing and a hospital towel and bedding used during the examination were also collected and placed in bags. Podlogar stated that a physician had ordered an X-ray of T.G.'s tailbone and a CT scan of her brain but that the tests revealed nothing significant.

{¶ 25} Podlogar testified that, as of the date of trial, T.G.'s clothing (which had been taken by East Cleveland police) and T.G.'s hospital medical records, including the photographs she had taken of T.G.'s injuries, had not been located. As such, she could not state whether a toxicology screen had been performed on T.G.'s blood following the incident. The hospital towel, blanket and a sheet containing "sandy dirt, debris" that had been in use during the exam were identified by Podlogar and admitted into evidence.

{¶ 26} Ralph Woods, a retired East Cleveland police officer, was the officer who received T.G.'s report that she had been raped on October 25, 2004. Based on his review of the police report he had prepared, Woods testified that T.G. had, at that time, identified her assailant as a man named "Ron" and had described him as a black male, dark complexion, in his late thirties, medium build, 5'10" tall, 180 pounds, with black eyes, a round face, short, black, greasy hair, a full beard and glasses. Woods stated that T.G. reported that her assailant had "[c]hoked/strangled" her and then raped her. He stated that after T.G. reported the incident, she and G.G. took him to the location where the alleged assault occurred, i.e., behind a house on Emily Street in East Cleveland.

{¶ 27} Woods testified that he canvassed the area to see if he could find any neighbors or others who had witnessed the incident and spoke with Jacqueline Jones,[3] who lived near the scene of the alleged assault. He indicated that he "wrote down what she stated" in his police report. Woods testified that after he retrieved the sexual assault kit and a bag containing T.G.'s clothing from the hospital and placed them in the East Cleveland Police Department's evidence locker, he had no further involvement in the case.

{¶ 28} In 2020, Christy Kernik, an investigator in the Cuyahoga County Prosecutor's Office Cold Case Sexual Assault Unit, was assigned to investigate the incident. After reviewing the police report and case documents, she attempted to

---

[3] It is unclear from the record whether Jacqueline Jones was related to appellant.

locate and contact T.G. On July 27, 2020, Kernik interviewed T.G. and took a statement from her. Kernik testified that, as part of her continuing investigation, she interviewed G.G., retrieved evidence from the East Cleveland Police Department, attempted to track down the individual who had picked up T.G. and driven her to the clinic following the alleged assault and attempted to obtain a complete copy of T.G.'s hospital medical records, including photographs, relating to the incident. Kernik stated that she determined that Jacqueline Jones (who had been identified in the initial police report) was deceased. She indicated that her efforts to locate the individual who took T.G. to the clinic were unsuccessful and that, aside from an x-ray and CT scan (and the sexual assault kit notes, which had been kept in the sexual assault kit), the hospital had been unable to locate T.G.'s hospital medical records relating to the incident. On July 1, 2021, Kernik obtained and executed a search warrant to obtain a DNA sample from Jones.

{¶ 29} Andrew Sawin, a forensic scientist with the Ohio Bureau of Criminal Investigation ("BCI"), testified regarding the DNA evidence in the case. He stated that BCI received T.G.'s sexual assault kit and a DNA sample for T.G. in September 2013 and that initial DNA testing was completed in July 2015. He indicated that further DNA analysis, comparing Jones' DNA profile to "unknown" DNA profiles in the samples from T.G.'s sexual assault kit, was completed in July 2021 after BCI received a DNA sample for Jones.

{¶ 30} Sawin testified that, based on the testing performed, Jones' DNA profile was consistent with DNA found in multiple samples collected as part of T.G.'s

sexual assault kit, including DNA in the sperm fraction of vaginal swabs (with an estimated frequency of occurrence rarer than 1 in 1 trillion unrelated individuals), DNA in the sperm fraction of pubic hair combings and thigh/eternal genitalia swabs (with an estimated frequency of occurrence rarer than 1 in 1 trillion unrelated individuals), DNA in fingernail scrapings (with an estimated frequency of occurrence of 1 in 50,000,000 unrelated individuals), and DNA in breast swabs (with an estimated frequency of occurrence of 1 in 1,000,000 unrelated individuals).

{¶ 31} In addition to witness testimony, the state introduced into evidence various exhibits, including T.G.'s sexual assault kit, the sexual assault kit notes, photographs of T.G. taken in or around 2004, documents relating to the photo lineup T.G. reviewed in 2020, evidence submission sheets and envelopes, BCI lab reports dated July 13, 2015 and July 22, 2021, a death certificate for Jacqueline Jones and the hospital towel and bedding from T.G.'s sexual assault examination.

{¶ 32} After the state rested, Jones moved for a judgment of acquittal pursuant to Crim.R. 29. The trial court denied the motion. Jones also orally renewed his motion to dismiss due to preindictment delay, arguing that prejudice to Jones' defense had been established based on evidence presented at trial that (1) emergency room records, including photographs of T.G. and a toxicology report, were missing or lost, (2) "critical clothing" T.G. had been wearing was lost, (3) Jacqueline Jones, "a potential eyewitness," was deceased and (4) the man who had picked up T.G. and transported her to the clinic was "missing." The state responded that all of the arguments Jones had then raised had been previously raised or could

have been raised during the pretrial hearing on his motion to dismiss and that any claim that evidence favorable to the defense had been lost due to preindictment delay was purely speculative. The trial court denied the renewed motion to dismiss.

{¶ 33} The defense rested without presenting any witness testimony, and Jones renewed his motion for a judgment of acquittal. Once again, the trial court denied the motion.

{¶ 34} On June 6, 2023, the jury found Jones guilty of rape in violation of R.C. 2907.02(A)(2) and kidnapping in violation of R.C. 2905.01(A)(4) with a sexual motivation, as charged. The jury found Jones not guilty of gross sexual imposition.

{¶ 35} The trial court then addressed the issues as to which Jones had waived his right to a jury trial. The state introduced certified copies of journal entries reflecting that Jones had been previously convicted of robbery in violation of R.C. 2911.02 in Cuyahoga C.P. No. CR-86-213309-ZA and of attempted kidnapping in violation of R.C. 2923.02/2905.01 in Cuyahoga C.P. No. CR-93-298565-ZA, and the parties stipulated that Jones was, in fact, the person convicted in those journal entries. On June 9, 2023, the trial court found Jones guilty of the notices of prior conviction and repeat violent offender specifications associated with the rape and kidnapping charges.

{¶ 36} On July 31, 2023, the trial court sentenced Jones to nine years in prison on each count, to be served concurrently. The trial court also imposed five years of mandatory postrelease control and classified Jones as a sexually oriented offender.

{¶ 37} Jones appealed, raising the following three assignments of error for review:

> Assignment of Error No. 1: The jury found, against the manifest weight of the evidence, that the appellant committed the acts alleged in the indictment.

> Assignment of Error No. 2: The evidence was not legally sufficient to sustain a guilty verdict.

> Assignment of Error No. 3: The trial court erred upon failing to dismiss the case due to prosecutorial delay.

{¶ 38} For ease of discussion, we address Jones' assignments of error out of order and together where appropriate.

**Law and Analysis**

**Preindictment Delay**

{¶ 39} We first address Jones' third assignment of error. In his third assignment of error, Jones contends that the trial court erred in denying his motion to dismiss due to preindictment delay because (1) the state "neglected" to prosecute the case for nearly 16 years, (2) the length of the delay was presumptively prejudicial, (3) there was no justification for the delay in prosecution, (4) Jones did nothing to cause or contribute to the delay and (5) Jones demonstrated actual prejudice as a result of the delay, i.e., that "critical witnesses are dead or no longer able to testify about the gist of the incident, i.e., consent or force."

{¶ 40} The state responds that the trial court properly denied the motion to dismiss because Jones failed to establish "actual and substantial prejudice" as a result of the preindictment delay and because "the reasons for the delay are

justifiable" given that "new evidence ha[d] become available in the form of DNA evidence and participation by T.G."

{¶ 41} "[W]hen unjustifiable preindictment delay causes actual prejudice to a defendant's right to a fair trial despite the state's initiation of prosecution within the statutorily defined limitations period, the Due Process Clause affords the defendant * * * protection." *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 11. "'An unjustifiable delay between the commission of an offense and a defendant's indictment therefor, which results in actual prejudice to the defendant, is a violation of the right to due process of law'" under the Ohio and United States Constitutions. *Id.* at ¶ 12, quoting *State v. Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097 (1984), paragraph two of the syllabus.

{¶ 42} The Ohio Supreme Court has "firmly established" a "burden-shifting framework" for determining whether preindictment delay amounts to a violation of due process. *Jones* at ¶ 13. "Once a defendant presents evidence of actual prejudice [to his or her defense], the burden shifts to the state to produce evidence of a justifiable reason for the delay." *Id.* A delay in commencing prosecution will not be justified if the state uses the delay to gain a tactical advantage or through negligence or error in judgment ceases its investigation and then later, without new evidence, decides to prosecute. *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 98, citing *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), and *Luck* at 158. "The length of delay will normally be the key factor in determining whether a delay caused by negligence or error in judgment is

justifiable." *Luck* at 158. If, however, a defendant fails to establish prejudice, it is unnecessary to consider the reasons for the delay. *See Jones* at ¶ 16; *Adams* at ¶ 107.[4]

**{¶ 43}** Determining whether actual prejudice exists "involves '"a delicate judgment"' and case-by-case consideration" based on the particular facts and circumstances of the case. *Jones* at ¶ 20, quoting *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 52, quoting *Marion* at 325. The court considers the evidence as it exists when the indictment is filed and the prejudice the defendant will suffer at trial due to the delay. *Jones* at ¶ 20, citing *Walls* at ¶ 52. A claim of actual prejudice must be "scrutinized * * * vis-à-vis the particular evidence that was lost or unavailable as a result of the delay," specifically, "the relevance of the lost evidence and its purported effect on the defense." *Jones* at ¶ 23.

**{¶ 44}** Speculative claims of prejudice or vague assertions of prejudice are insufficient to meet a defendant's burden. *Jones* at ¶ 27 (A defendant cannot rely on "mere speculation to support a claim of prejudice."); *see also State v. Meeks*, 5th Dist. Delaware No. 21 CAA 20 0010, 2022-Ohio-6, ¶ 53 ("Proof of actual prejudice must be specific, particularized, and non-speculative."). "The 'possibility that memories will fade, witnesses will become inaccessible, or evidence will be lost is not sufficient to establish actual prejudice.'" (Emphasis deleted.) *Jones* at ¶ 21,

_____

4 In *State v. Bourn*, 172 Ohio St.3d 343, 2022-Ohio-4321, 224 N.E.3d 1, the Ohio Supreme Court again considered what a defendant must show to demonstrate actual prejudice when claiming unconstitutional preindictment delay in a rape case. There was no majority opinion in the case. Accordingly, we continue to apply the analysis set forth in *Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688.

quoting *Adams* at ¶ 105.  However, "[t]hat does not mean * * * that demonstrably faded memories and actually unavailable witnesses or lost evidence cannot satisfy the actual-prejudice requirement." *Jones* at ¶ 21.  The "proven unavailability of specific evidence or testimony that would attack the credibility or weight of the state's evidence against a defendant and thereby aid in establishing a defense may satisfy the due-process requirement of actual prejudice." *Id.* at ¶ 25.  "Actual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *Id.* at ¶ 28, citing *Luck* at 157-158.

{¶ 45} In reviewing a trial court's ruling on a motion to dismiss for preindictment delay, we apply a de novo standard of review to issues of law but afford great deference to the trial court's findings of fact.  *See, e.g., State v. Jabbar*, 8th Dist. Cuyahoga No. 109642, 2021-Ohio-1191, ¶ 19-20; *State v. Kocevar*, 2023-Ohio-1513, 213 N.E.3d 1240, ¶ 60 (2d Dist.).

{¶ 46} In his motion to dismiss, Jones claimed that he had been prejudiced by the loss of the following evidence as a result of the state's preindictment delay:

> 1. The believed male nurse named "Terry" who picked [T.G.] up[,] convinced her to go to his employment and who called 911 for her.
> 2. 911 calls.
> 3. Photographs of any alleged injuries and/or other records related thereto.
> 4. All of the members of the East Cleveland Police Department that took a report; the detectives and officers have presumably retired long ago.
> 5. All of the hospital personnel that examined and interviewed the alleged victim.

6. An accurate recollection of the alleged incident by all individuals and witnesses involved; {victim changed her version from [sic] in critical fashion f[rom] 2004 to 2020}
7. The victim's mother who allegedly took her to the hospital. Her testimony regarding what her daughter told her is critical. However when interviewed in 2020 she reported a brain tumor and loss of memory.
8. Harvey Randall who is deceased. He lived at 126th and St. Clai[r] who spoke with the defendant in the morning who would have been able to corroborate there was consensual sex for money.
9. Dianne Wynn who is deceased. She would have been able to corroborate the incident was consensual and an exchange of sex for money.

{¶ 47} In his renewed motion to dismiss, after the state concluded its case, Jones argued that prejudice to his defense had been shown based on evidence at trial that (1) the emergency room records, including photographs of T.G. and a toxicology report, were missing or lost, (2) "critical clothing" T.G. had been wearing was lost, (3) Jacqueline Jones, "a potential eyewitness," was deceased and (4) the man who had allegedly picked T.G. up and transported to the clinic following the incident was "missing." The trial court summarily denied both Jones' pretrial motion to dismiss and his renewed motion to dismiss. The trial court did not make any explicit findings of fact and did not explain the basis for its rulings.

{¶ 48} Following a thorough review of the record, we cannot say that the trial court erred in denying Jones' motion to dismiss due to preindictment delay. Jones has not met his burden of showing that he sustained actual prejudice as a result of the state's preindictment delay.

{¶ 49} First, contrary to Jones' assertion, prejudice is not presumed, for purposes of a motion to dismiss based on preindictment delay, solely due to a

lengthy delay in prosecution. *Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, at ¶ 98; *State v. Herns*, 7th Dist. Mahoning No. 23 MA 0055, 2024-Ohio-1099, ¶ 51. As stated above, it was Jones' burden to show actual prejudice to his defense resulting from the preindictment delay. He needed to show (1) that specific evidence was lost or unavailable due to the preindictment delay and (2) the exculpatory value of that evidence, i.e., how that lost or unavailable evidence would have minimized or eliminated the impact of the state's evidence or otherwise bolstered his defense.

{¶ 50} Jones, however, submitted no affidavits or other evidence with his motion and offered no witness testimony or other evidence at the hearing on his motion pointing to missing evidence or unavailable testimony that would have minimized or eliminated the impact of the state's evidence or bolstered his defense. His motion to dismiss was supported by nothing more than speculative, conclusory assertions and the arguments of counsel. For that reason alone, the trial court could have properly denied his motion to dismiss. *Cf. State v. McClellan*, 9th Dist. Summit No. 30304, 2023-Ohio-2152, ¶ 17 (where defendant submitted no affidavits or other evidence pointing to missing evidence or unavailable testimony that would have minimized or eliminated the impact of the state's evidence or bolstered his defense, defendant did not "adequately demonstrate[] that, if he had filed a timely motion to dismiss, it would have been granted").

{¶ 51} Second, considering each of the items of allegedly "lost" or "unavailable" evidence in light of (1) other evidence available at the time of the

indictment and (2) the relevance of the allegedly unavailable evidence to the defense, Jones has not shown how any of these items, if they had been available, would have meaningfully impacted his case. *See, e.g., State v. Craig*, 10th Dist. Franklin No. 22AP-215, 2023-Ohio-1003, ¶ 20 (""""Without proof of prejudice, meaning something which adversely affects [a defendant's] ability to defend himself at trial, there is no due process violation for preindictment delay in prosecution.""""), quoting *Meeks*, 2022-Ohio-6, at ¶ 53, quoting *State v. Davis*, 7th Dist. Mahoning No. 05 MA 235, 2007-Ohio-7216, ¶ 17.

{¶ 52} The missing recording of the 911 call: It is unknown, from the limited information available, who made the alleged 911 call, but there has been no claim that it was made by T.G. Given that the 911 call allegedly occurred after T.G. was picked up and transported to the clinic, there is no reason to believe that the loss of the recording resulted in the loss of evidence favorable to Jones. Jones has not shown that the missing recording would minimize or eliminate the state's evidence or bolster his defense.

{¶ 53} Missing photographs taken by the nurse, missing emergency room records and missing clothing: The evidentiary significance of the lost or missing emergency room records, photographs, toxicological report and clothing is purely speculative. There is no evidence as to whether a toxicological analysis was even performed on T.G.'s blood following the incident. Nevertheless, T.G. readily admitted that she had been drinking that evening, that she had likely used both marijuana and cocaine and that she was "buzzed" at the time of the incident. She

was subject to cross-examination regarding the extent to which her alcohol and drug use may have altered her perception or memory. Although the photographs Podlogar took of T.G.'s injuries following the incident are now missing, she also documented T.G.'s injuries in the sexual assault kit notes, including both a detailed description of the injuries she observed and photographed and a diagram showing the precise location of those injuries. Podlogar testified at trial and was subject cross-examination. There is no reason to believe that the photographs would have shown materially different injuries from those documented in the sexual assault kit notes or that other emergency room records would have contained materially different, relevant information from what was included in the sexual assault kit notes.

{¶ 54} Likewise, Jones has not identified any specific, relevant evidence that examination or testing of T.G.'s clothing would have revealed that was not available elsewhere. Based on the samples collected as part of the sexual assault kit, there was ample DNA evidence establishing that Jones engaged in sexual conduct with T.G. Examination or testing of T.G.'s clothing would have had no bearing on whether that conduct was the product of force or a consensual encounter. Jones has not shown that this missing evidence would minimize or eliminate the state's evidence or bolster his defense.

{¶ 55} G.G.'s memory loss: G.G. testified at trial and was subject to cross-examination. G.G. testified that she met T.G. at the hospital following the incident and testified both as to her observation of T.G. at the hospital and what happened

after they left the hospital. She did not witness the incident. There is nothing in the record to suggest that G.G.'s memory loss following her 2019 brain tumor resulted in the loss of any evidence favorable to Jones' defense.

{¶ 56} Unidentified, missing or deceased witnesses: Jones also asserts that he was prejudiced due to the loss of testimony from "crucial" unidentified, lost, missing and/or deceased witnesses, including (1) "[a]dditional members of the East Cleveland Police Department," (2) "[h]ospital personnel that examined and interviewed the alleged victim, other than the SANE nurse," (3) the unidentified man who picked up T.G. following the incident and took her to a clinic and (4) Harvey Randall, Dianne Wynn and Jacqueline Jones.

{¶ 57} In order to establish actual prejudice caused by the unavailability of witnesses, the defendant must first prove that the witnesses are in fact unavailable. *State v. Walker*, 8th Dist. Cuyahoga No. 106414, 2018-Ohio-3669, ¶ 20. "A defendant's bald assertion that witnesses are unavailable because they cannot be found is not sufficient to establish the unavailability of the witnesses." *Id.* "Evidence that a witness is deceased is obviously sufficient to establish the witness's unavailability. However, the death of a witness, by itself, is not enough to establish actual prejudice." *Id.* ¶ 22, citing *Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, at ¶ 26.

{¶ 58} "The death of a potential witness during the preindictment period can constitute prejudice, * * * if the defendant can identify exculpatory evidence that was lost and show that the exculpatory evidence could not be obtained by other means."

*Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, at ¶ 103. For example, a defendant may establish actual prejudice where he or she is unable to seek verification of his or her story from a deceased witness. *See, e.g.*, *Jones* at ¶ 28; *Luck*, 15 Ohio St.3d at 157-158, 472 N.E.2d 1097.

{¶ 59} Although a defendant need not identify "what the exact substance of an unavailable witness's testimony would have been," there must be some indication in the record of what testimony the unavailable witness might have offered to show that the unavailable testimony "would minimize or eliminate the impact of the state's evidence and bolster the defense." *Jones* at ¶ 27-28; *see also Craig*, 2023-Ohio-1003, at ¶ 23 ("[W]hile precision is not required, a defendant must explain what testimony the unavailable witness might have offered."); *Walker* at ¶ 23. "'[A] defendant cannot rely upon broad assertions of missing evidence or an unavailable witness to establish prejudice.'" *Walker* at ¶ 22, quoting *State v. Richardson*, 2016-Ohio-5843, 70 N.E.3d 1175, ¶ 13 (8th Dist.). A defendant must demonstrate "a viable, tangible connection" between the missing testimony from the unavailable witness and the defense of the case. *Herns*, 2024-Ohio-1099, at ¶ 49; *Walker* at ¶ 22.

{¶ 60} Although Jones claimed, in his motion to dismiss, that Woods, the retired East Cleveland police officer who took T.G.'s report in 2004, was unavailable, in fact, he testified and was subject to cross-examination at trial. Woods testified regarding his investigation as documented in the police report he had prepared around the time of the incident, i.e., that he spoke with T.G., that T.G. and G.G. took

him to the scene of the assault and the results of his attempt to locate witnesses. There is no evidence in the record that any additional East Cleveland police officers other than Woods took any statements from T.G. or performed any investigation of the incident.

{¶ 61} Likewise, Podlogar, the nurse, testified at length at trial and was subject to cross-examination regarding her examination of T.G. and T.G.'s statements to her regarding what occurred. Although other "hospital personnel" may have examined or spoken with T.G. following the incident, none of them witnessed the incident. There is nothing in the record to suggest that any of these witnesses would have had materially different, relevant information from what was testified to by Podlogar or contained in the sexual assault kit notes. Jones failed to show that any testimony from other hospital personnel would minimize or eliminate the state's evidence or bolster his defense.

{¶ 62} Similarly, Jones has not shown that he was prejudiced by the unavailability of the man who allegedly picked up T.G. and brought her to the clinic following the incident. There is no claim that this man witnessed the alleged assault. Although he may have been able to offer evidence regarding where he picked up T.G. and her appearance immediately following the incident, there is nothing in the record to suggest that he could have offered any evidence favorable to the defense that was not available elsewhere.

{¶ 63} With respect to the "deceased" witnesses[5] — Jacqueline Jones, Harvey Randall, Dianne Wynn — although Jones describes some or all of these witnesses as "eyewitnesses" in his appellate brief, there is nothing in the record (1) to indicate that any of these individuals (or any other third party) witnessed the incident or (2) to otherwise explain how their testimony would have assisted his defense. As stated above, Jones did not submit any affidavits or other evidence in support of his motion to dismiss and did not testify at the hearing on his motion or at trial.

{¶ 64} In his motion, Jones asserted that Harvey Randall and Dianne Wynn "would have been able to corroborate the incident was consensual and an exchange of sex for money" but he did not explain what their connection was to the case or how or why they would have allegedly "been able to corroborate the incident was consensual and an exchange of sex for money." *See State v. Figueroa*, 11th Dist. Trumbull No. 2018-T-0071, 2019-Ohio-3151, ¶ 21, 23 (death of defendant's neighbor during preindictment period who defendant claimed could have "tied" him to informant did not constitute prejudice where defendant provided no explanation as to how witness would have aided defendant's defense or undermined the state's case); *State v. McCoy*, 8th Dist. Cuyahoga No. 107029, 2019-Ohio-868, ¶ 12-15 (where defendant "offered nothing to show that any of the three [allegedly unavailable witnesses] were actually present when the criminal acts occurred,"

---

[5] Although the state admitted Jacqueline Jones' death certificate into evidence at trial, Jones presented no evidence to support his claim that Harvey Randall or Dianne Wynn were deceased.

"fail[ing] to demonstrate 'a viable, tangible connection between the missing evidence or the unavailable witness to the defense of the case,'" defendant did not establish actual prejudice), quoting *Walker*, 2018-Ohio-3669, at ¶ 22. Based on T.G.'s testimony — the only evidence in the record regarding the issue — she and her assailant were the only persons present during the alleged assault.

{¶ 65} In arguing his renewed motion to dismiss at trial, Jones shifted his focus away from Randall and Wynn and argued that he was prejudiced by the loss of testimony from Jacqueline Jones, the neighbor with whom Woods spoke when canvassing the neighborhood following the incident. But no witness statements were offered into evidence[6] and there is nothing in the record beyond mere speculation that Jacqueline Jones witnessed anything relevant to the charges here. Jones has not offered any explanation of what, if any, facts or information Jacqueline Jones would have been able to provide, that would have aided his defense or undermined the state's case, had he been prosecuted before she died in September 2014. Speculation that she or any other witness could have had information favorable to his defense does not meet Jones' burden of showing actual prejudice.

{¶ 66} Jones asserts that the facts in this case are similar to those in *State v. Mack*, 8th Dist. Cuyahoga No. 100965, 2014-Ohio-4817, and *State v. Crymes*, 8th Dist. Cuyahoga No. 104705, 2017-Ohio-2655 — in which we held that the trial court

---

[6] Although Woods testified at trial that he "wrote down what [Jacqueline Jones] stated" in his police report, the police report, which Woods reviewed prior to his testimony, was not admitted as an exhibit at trial or submitted with his motion to dismiss.

had properly granted the defendants' motions to dismiss due to preindictment delay.[7] We disagree.

{¶ 67} In *Mack*, multiple witnesses, including the responding officers and two of the three detectives who investigated the case, were unavailable; the recording of 911 call allegedly made by the victim was unavailable; the defendant claimed that the alleged victim had admitted that she and the defendant had had consensual sexual relations on multiple occasions prior to the time he had allegedly raped her and the defendant was being prosecuted for a crime he allegedly committed as a juvenile despite his identity always being known. *Id.* at ¶ 2-3, 10. Based on the particular facts in that case, this court held that the defendant had established actual prejudice and that the state's reason for the delay — the lack of

[7] In support of his third assignment of error, Jones also cites numerous cases addressing postindictment delay and the standard applicable when determining whether a defendant's constitutional right to a speedy trial has been violated. (*See* Appellant's Br. at 16, 18-21, 24-25.) For example, Jones cites *State v. Burden*, 5th Dist. Stark No. 2012-CA-00074, 2013-Ohio-1628, for the proposition that "[e]ven in the event that a defendant cannot point to actual prejudice caused by a delay in prosecuting alleged criminal conduct the length of the delay, standing alone, may also support a dismissal." However, as stated in *Burden*:

> The notion that prejudice may be presumed from a lengthy delay arises in the context of the four-part balancing test used in determining whether a post-indictment or post-accusation delay has deprived a defendant of his Sixth Amendment right to a speedy trial. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The *Barker* four-part test, and the concept of presumptive prejudice, applies only to post-indictment or post-accusation delays that implicate the Sixth Amendment right to a speedy trial, and has no application to pre-indictment delays. * * *

*Burden* at ¶ 33. Jones' motion to dismiss was based on preindictment delay, not an alleged violation of Jones' right to a speedy trial. Accordingly, those cases have no application here.

cooperation by the alleged victim — did not outweigh the prejudice to the defendant. *Id.* at ¶ 10-11.

{¶ 68} In *Crymes*, 2017-Ohio-2655, the defendant claimed that he was prejudiced by the unavailability of phone records that could have negatively impacted the alleged victim's credibility. The alleged victim had told the police that she did not know why the defendant had come over to her house the morning of the alleged rape. *Crymes* at ¶ 4. The defendant, however, had given a statement to police in which he claimed that the alleged victim had been his girlfriend, that they had previously engaged in consensual sex and that the alleged victim had called him twice in the early morning on the date of the alleged rape, asking if he was coming over to her house. *Id.* at ¶ 3. This court held that the defendant showed actual prejudice from the loss of the phone records because evidence of the specific phone calls from the alleged victim's house to the defendant before the incident, "although not direct proof of consent, would help [the defendant] verify his account of the event, thereby bolstering the defense" and "could well contradict the victim's account of the event," minimizing the impact of her testimony. *Id.* at ¶ 19-21. This court further held that the state had failed to meet its burden of showing that the delay in prosecution was justified because it had provided no reason or justification for the delay. *Id.* at ¶ 22.

{¶ 69} As detailed above, the facts here are very different from those in *Mack* and *Crymes*. Unlike in those cases, where the alleged perpetrator was known to authorities from the outset of the case, T.G.'s alleged assailant was a stranger whose

identity was not known until DNA testing linked him to the alleged assault. The alleged missing witnesses here were not the original investigating police officers; the missing recording of the 911 call here was not a 911 call made by the alleged victim and other alleged missing evidence here did not involve alleged direct, pre-incident communications between the alleged victim and the defendant.

{¶ 70} We are mindful more than ten years passed between the time of alleged rape and the testing of T.G.'s sexual assault kit — when Jones was potentially linked to the DNA found in the sexual assault kit — and that another five years passed before the state indicted Jones. As this court previously acknowledged, when considering a similar timeline, "[t]his timeline does not put the state's preindictment delay in a good light." *State v. Miller*, 8th Dist. Cuyahoga No. 109543, 2021-Ohio-1878, ¶ 35. "However, the burden-shifting analysis set forth by the Ohio Supreme Court in *Jones* made clear that, before courts review whether the state's delay was unjustifiable, the defendant must present evidence of actual prejudice." *Id.*

{¶ 71} Jones did not establish the existence of any missing or unavailable evidence that would "cut into the state's case" or "bolster his own." *Id.* Having concluded that Jones failed to meet his burden of showing actual prejudice, we need not consider the reasons for the preindictment delay and whether those reasons justified the delay. *Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, at ¶ 16, 18; *Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, at ¶ 107.

{¶ 72} Jones' third assignment of error is overruled.

**Sufficiency of the Evidence and Manifest Weight of the Evidence**

{¶ 73} In his first and second assignments of error, Jones contends that his convictions for rape and kidnapping were not supported by sufficient evidence and were against the manifest weight of the evidence. In his second assignment of error, Jones contends that his convictions for rape and kidnapping should be vacated because "T.G.'s testimony alone" that Jones' sexual contact with her "was not consensual" was insufficient to prove his guilt beyond a reasonable doubt. In his first assignment of error, Jones contends that his convictions were against the manifest weight of the evidence due to the state's "failure to provide crucial evidence."

{¶ 74} Although sufficiency and manifest weight challenges involve different standards of review, because, here, they are based on virtually the same arguments and evidence (or the alleged lack thereof), we address them together.

{¶ 75} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state has met its burden of production at trial. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41. The relevant inquiry in a sufficiency challenge is "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. The court examines all the evidence admitted at trial to determine whether such

evidence, if believed, would convince a reasonable juror of the defendant's guilt beyond a reasonable doubt. *State v. Williams*, 8th Dist. Cuyahoga No. 111922, 2023-Ohio-2296, ¶ 81, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997) (Cook, J., concurring); *see also State v. Bankston*, 10th Dist. Franklin No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). Whether the evidence is legally sufficient to support a verdict is a question of law. *Thompkins* at 386.

{¶ 76} In contrast to a challenge based on sufficiency of the evidence, a manifest weight challenge attacks the credibility of the evidence presented. "'"[W]eight of the evidence involves the inclination of the greater amount of credible evidence."'" *State v. Harris*, 8th Dist. Cuyahoga No. 109060, 2021-Ohio-856, ¶ 32, quoting *Thompkins* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990). When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "'thirteenth juror'" and may disagree "with the factfinder's resolution of * * * conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that

the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 77} Jones was convicted of rape in violation of R.C. 2907.02(A)(2) and kidnapping in violation of R.C. 2905.01(A)(4). R.C. 2907.02(A)(2) states: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2905.01(A)(4) states, in relevant part: "No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: * * * [t]o engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will."

{¶ 78} Jones contends that "the only evidence" the state presented to prove that Jones' sexual conduct with T.G. "was not consensual" was "T.G.'s testimony nearly 19 years later" and that "[h]er testimony alone" was insufficient to prove his guilt beyond a reasonable doubt because (1) "back in 2004, she was under the influence of alcohol, marijuana and probably cocaine" and (2) in 2010 and 2011, she was "convicted * * * of crimes that stemmed from untruthfulness." Jones further contends that because "key evidence" was "missing" from the state's case — including (1) testimony from "crucial" witnesses such as the individual who allegedly

drove T.G. to the clinic, G.G. (who had suffered memory loss) and the two deceased individuals with whom Jones "had spoken to the morning of the incident, who would have corroborated his version of events" and (2) T.G.'s clothing, complete hospital medical records and photographs of her injuries — the state's evidence was "unreliable," incomplete and "uncertain and fragmentary," such that these convictions were against the manifest of the evidence. We disagree.

{¶ 79} As detailed above, the state presented ample, credible evidence upon which a reasonable jury could have found, beyond a reasonable doubt, that Jones raped and kidnapped T.G. as charged.

{¶ 80} A conviction may rest solely on the testimony of a single witness, including the alleged victim, if believed, and there is no requirement that a witness' testimony be corroborated to be believed. *See, e.g., State v. Washington*, 2023-Ohio-1667, 214 N.E.3d 1188, ¶ 119 (8th Dist.); *State v. Williams*, 8th Dist. Cuyahoga No. 111922, 2023-Ohio-2296, ¶ 87; *State v. Nicholson*, 8th Dist. Cuyahoga No. 110595, 2022-Ohio-2037, ¶ 180; *State v. Jones*, 8th Dist. Cuyahoga No. 108371, 2020-Ohio-3367, ¶ 71; *State v. Flores-Santiago*, 8th Dist. Cuyahoga No. 108458, 2020-Ohio-1274, ¶ 38. This includes cases that involve allegations of rape or other forms of sexual assault. *See, e.g., State v. Williams*, 2023-Ohio-1748, 215 N.E.3d 629, ¶ 35-36 (8th Dist.); *State v. Black*, 2019-Ohio-4977, 149 N.E.3d 1132, ¶ 43 (8th Dist.); *State v. Schroeder*, 2019-Ohio-4136, 147 N.E.3d 1, ¶ 84 (4th Dist.).

{¶ 81} Here, T.G. testified her assailant, a stranger, "grabbed" her, "yanked" her and "dragged" down a dark alleyway and behind a house as she attempted to

fight him off. She testified that her assailant "threw [her] down," forced her to the ground and slammed her head against the ground while he was on top of her, before taking off her pants and raping her. The state presented DNA evidence from T.G.'s sexual assault examination kits that linked Jones to the rape.

{¶ 82} When viewed in the light most favorable to the state, the evidence presented at trial was sufficient for a rational jury to find, beyond a reasonable doubt, that Jones "engage[d] in sexual conduct" with T.G., "purposely compel[ing] [her] to submit by force or threat of force," and forcibly removed T.G. or "restrain[ed]" her "liberty" in order to engage in sexual activity with her "against [her] will" to support Jones' convictions for rape and kidnapping under R.C. 2907.02(A)(2) and 2905.01(A)(4).

{¶ 83} At trial, Jones did not dispute that he had had sexual intercourse with T.G. Instead, defense counsel argued that T.G.'s decisionmaking may have been impaired by her drug and alcohol use, that "[m]aybe she decided to go out there and meet a guy, have some indiscriminate sexual liaison," that "[m]aybe," after the fact, she was "embarrassed" and "had buyer's remorse" and that she was "a liar," as evidenced by her prior "adjudicat[ion] by the criminal justice system as being dishonest," alleged inconsistencies in her prior statements and testimony and the alleged implausibility of her version of events.

{¶ 84} Simply because T.G. (1) has a criminal record and (2) admitted to using drugs and alcohol and being "buzzed" at the time of the incident does not mean that her testimony could not be relied upon to convict Jones. *See, e.g., State v.*

*Robertson*, 8th Dist. Cuyahoga No. 106279, 2018-Ohio-2934, ¶ 29; *State v. Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, ¶ 44 (8th Dist.); *see also State v. Wells*, 8th Dist. Cuyahoga No. 98388, 2013-Ohio-3722, ¶ 130 (credibility of witnesses in murder case was left to the jury where witnesses admitted they were high on crack cocaine the day of the murder and had "extensive criminal histories"); *State v. Medezma-Palomo*, 8th Dist. Cuyahoga No. 88711, 2007-Ohio-5723, ¶ 36-37 (fact that witnesses "were all consuming crack cocaine and heroin on a daily basis" and that several of the state's witnesses had criminal records did not preclude the jury from finding their testimony to be credible); *State v. Petty*, 10th Dist. Franklin Nos. 11AP-716 and 11AP-766, 2012-Ohio-2989, ¶ 41 (fact that witnesses had criminal records and struggled with substance abuse did not render their testimony unreliable; jury could properly weigh information regarding witnesses' criminal histories and drug use in determining how much credibility to give their testimony).

{¶ 85} Likewise, a defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness' testimony are not credible or were inconsistent or contradictory. *State v. Williams,* 8th Dist. Cuyahoga No. 112800, 2024-Ohio-838, ¶ 54; *Flores-Santiago,* 2020-Ohio-1274, at ¶ 40; *Nitsche* at ¶ 45; *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38. "The jury may detect any number of inconsistencies and resolve them accordingly." *Williams* at ¶ 54.

{¶ 86} T.G. answered questions regarding her criminal history and her alcohol and drug use during her direct and cross-examinations. The jury heard T.G.

admit that she had been drinking, was "buzzed," had smoked marijuana and had likely used cocaine prior to the incident. The jury also heard T.G. admit that, in 2010 and 2011, she had been convicted of theft and misuse of a credit card. Through his cross-examination, defense counsel identified certain inconsistencies in T.G.'s trial testimony and her prior statements to police and Podlogar and brought them to the attention of the jury. The jury, having heard T.G.'s testimony and the other evidence presented at trial, was able to judge the credibility of T.G. for itself and was """free to believe all, some, or none of [her] testimony""" (as well as that of the other witnesses appearing before it). *See, e.g., Jones*, 2020-Ohio-3367, at ¶ 85, quoting *State v. Sheline*, 8th Dist. Cuyahoga No. 106649, 2019-Ohio-528, ¶ 100, quoting *State v. Colvin*, 10th Dist. Franklin No. 04AP-421, 2005-Ohio-1448, ¶ 34. Jones has not shown that T.G.'s testimony was so inherently incredible or unreliable as to preclude a reasonable factfinder from believing her.

{¶ 87} Further, contrary to Jones' assertion, T.G.'s testimony was not the only evidence presented at trial that supported his convictions. The state presented evidence that, shortly after the incident, T.G. went to the hospital, where she agreed to submit to an invasive sexual assault examination. Podlogar testified regarding the significant bruising she observed on T.G. during the examination, including abrasions to her right cheek and above her left eye, abrasions on both breasts, scratches linearly across her upper right thigh, bruises on her hands and her left posterior arm and abrasions to the sacrococcyx area — bruising that was arguably inconsistent with an ordinary consensual sexual encounter and arguably consistent

with efforts to fight off an attacker. Although the photographs Podlogar took of those injuries have been lost, she clearly documented T.G.'s injuries in the sexual-assault kit notes, including in a detailed diagram. *See State v. Dudley*, 9th Dist. Summit No. 28364, 2017-Ohio-7044, ¶ 10 (holding the state was not required to present photographs or medical records to corroborate witness' testimony regarding injuries). The state also presented evidence that Jones' DNA matched DNA found in samples taken from T.G.'s breasts, vagina, pubic hair, thigh/eternal genitalia and fingernail scrapings.

{¶ 88} Following a thorough review of the record, weighing the strength and credibility of the evidence presented at trial and the reasonable inferences to be drawn therefrom, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that Jones' convictions must be reversed. This is not the "'exceptional case'" in which the evidence weighs heavily against Jones' convictions. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

{¶ 89} We overrule Jones' first and second assignments of error.

{¶ 90} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds that there were reasonable grounds for these appeals.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR